[Civ. No. 13212.   Second Dist., Div. Two.   July 8, 1942.]

GEORGE W. BURFORD et al., Respondents, v. DR. W. DONALD BAKER, Appellant.

Parker & Stanbury and Raymond G. Stanbury for Appellant.

Frank Desimone and S. L. Kurland for Respondents.

WOOD (W. J.) J.—Plaintiff commenced this action to recover damages for the malpractice of defendant physician. Defendant has appealed from a judgment in plaintiff's favor in the sum of $7,500. The parents of the minor plaintiff joined

with him in the action but no judgment was entered in their favor and they are not parties to the appeal.

Plaintiff, who was a minor of the age of fourteen years at the time of the treatment complained of, for some time had been suffering from a pituitary disturbance which rendered his growth and development abnormal. Defendant, an osteopathic physician and surgeon, became the family physician in August, 1936, and undertook to treat plaintiff for his glandular deficiency. The treatment consisted of frequent injections, which course of treatment was continued until October, 1938, when defendant's services were terminated. In addition to caring for the glandular disturbance defendant also gave medical attention to all other ailments of plaintiff, including the removal of his tonsils, treatment for an attack of appendicitis and care of an injured wrist. On December 20, 1937, plaintiff was involved in an automobile accident, as a result of which he received injuries to his right hip. On the day of the accident plaintiff was taken to defendant's office by his father and for the first time walked with a noticeable limp. Defendant's examination disclosed that plaintiff's hip was painful and reddish blue and swollen in an area about twelve inches in diameter. Plaintiff's father suggested that an X-ray be taken of the injured area but defendant stated that it was unnecessary because the injury was only a bruise or muscle strain and recommended the application of hot towels. The pain and discomfort did not subside under this treatment and plaintiff returned to defendant a week or two later, but defendant stated he could do nothing for him. Plaintiff's condition failed to improve and each time he went to defendant to be treated for his glandular condition he walked with an obvious limp and complained of the pain in his hip and leg. On several occasions defendant stated that arthritis had developed and advised plaintiff to exercise his leg as much as possible and to refrain from favoring the leg. Despite several requests by plaintiff's father, no X-rays of the injured hip were taken by defendant. Plaintiff continued to complain of intense pain and informed defendant that he could not put on or take off his right shoe or stocking and that he could not walk steadily. Several light treatments were administered by defendant during the period plaintiff remained in his care but no other treatment was given. Defendant insisted that the

leg should be exercised and that plaintiff should be prevented from forming the habit of favoring the right leg.

Plaintiff went to a Dr. Bailey in July, 1938, for relief from a pain which had developed in his back and informed Dr. Bailey of the history of the case and of the fact that defendant was treating his hip joint for arthritis. Dr. Bailey gave plaintiff osteopathic, manipulative treatments designed to relieve the back ache, but apparently did nothing for the hip injury. In October, 1938, an X-ray was taken of plaintiff's right hip and it was then discovered for the first time that he was suffering from a separation of the epiphysis of the right femur. Dr. Bailey attempted to reduce the separation, or fracture, as it was sometimes referred to by the witnesses, and placed plaintiff's right hip and leg in a cast. After the removal of the cast plaintiff was required to wear a built-up shoe and to walk on crutches. Dr. Bailey's treatment was unavailing, however, because the injured hip joint had already ankylosed, making an abnormal union. Plaintiff will, according to his experts, be crippled for life and, from time to time, will have painful spasms and contractions of his muscles. Defendant's right leg is one inch shorter than his left leg and there is a permanent loss of motion in his right hip. As a secondary result of his condition, he has developed a lateral curvature of the spine, known as scoliosis.

It is contended by defendant that the evidence is insufficient to sustain the court's finding to the effect that the epiphyseal separation took place during the time when plaintiff was under defendant's care. It was established by expert testimony that persons of plaintiff's type, i. e., the "fat boy" type, who are suffering from a pituitary gland deficiency, are liable to suffer an epipyhseal separation and that such a separation may be brought about with or without trauma of any character, but that trauma, such as that suffered by plaintiff, could have caused the separation. The expert witnesses further testified that the primary, most noticeable symptom of an epiphyseal separation is a limp. It was proved that immediately following the accident plaintiff developed a noticeable limp which was promptly brought to defendant's attention, and that he complained of pain in his hip, which condition continued during all of the time he was under defendant's care. After examining the X-rays of plaintiff's injured hip, numerous expert witnesses gave their opinions

as to the approximate time when the separation first occurred, fixing the time of the origin of the injury as being from four to twelve months prior to October 10, 1938, the date on which the X-rays were taken. This evidence, when considered with other circumstances in the case, was sufficient to establish a reasonable probability of the origin and existence of the injury during the time that plaintiff was under defendant's care. Plaintiff was not required to prove conclusively and beyond the possibility of doubt that the epiphyseal separation occurred during that time. The court could draw reasonable inferences from the circumstances established and base its findings thereon. It is established that: ''After the verdict of a jury [or decision of the court] has been fairly rendered, all the circumstances of the case, together with every reasonable inference which may be drawn therefrom, will be marshalled in support of the judgment. Because of the very subtleness of the origin and development of disease, less certainty is required in proof thereof.'' (*Sim* v. *Weeks,* 7 Cal. App. (2d) 28, 40 [45 Pac. 350] ; *Barham* v. *Widing,* 210 Cal. 206, 215 [291 Pac. 173].)

█ The finding that defendant was negligent is supported by substantial evidence. Several medical experts testified in effect that an osteopathic physician and surgeon who possessed the ordinary skill and knowledge of similar practitioners in the community in which defendant practiced, would under the circumstances disclosed by the evidence have had an X-ray taken of plaintiff's injured hip soon after plaintiff first developed the limp and complained of pain in his hip ; that upon discovering the epiphyseal separation, such practitioner would have treated it by reducing the fracture, or separation, and would have created immobilization by applying a cast thus protecting the injured member from weight-bearing. Not only did defendant fail to have an X-ray taken, but he also failed to immobilize the injured hip. Instead, he directed plaintiff to exercise the hip as much as possible.

█ Defendant argues that even if he was negligent, there is no evidence to establish that his negligence was the proximate cause of plaintiff's injury. Specifically, it is argued that there is no evidence to prove that proper diagnosis and treatment would have produced any result different from that which was shown to have existed at the time of trial. In support of his position defendant relies upon the testimony of some of the medical experts to the effect that plaintiff's

glandular deficiency produced a calcium shortage in his bones and was a predisposing factor in the epiphyseal separation; that the end result in this case, as disclosed by the X-rays, was a composite consequence of various factors which were inherent in the pre-existing disease, or glandular disturbance. We must, however, accept as true all evidence which is favorable to plaintiff and which supports the questioned finding, disregarding all evidence in conflict therewith. On behalf of plaintiff an expert witness testified that in case of a fracture or separation of the femoral epiphysis any weight-bearing or exercise of the injured member would tend to twist the head and neck of the femur and would be very detrimental; that upon discovery of such a separation rapid reduction and immobilization greatly enhance the probability of a good result; and where, as in this case, the patient has attempted to walk and perform the ordinary functions of life for ten months before the separation is discovered, the chances for success of attempted reduction and immobilization are "not so good." A physician testified that the destruction of the bone and distortion of the joint, as disclosed by the X-rays, was chiefly due to premature weight-bearing. Another expert testified that if the separated epiphysis had been recognized and adequate treatment instituted, particularly relief of weight-bearing, little or no ankylosis, narrowing of the joint space or shortening of the head or neck of the femur would have occurred; that deformity does not occur where proper treatment is instituted shortly after the fracture or separation and that the end result appearing from the X-rays in this case would probably not have appeared if early recognition of the condition had occurred and adequate treatment been instituted. One of defendant's experts was asked by defendant's counsel: "If a young man of Robert Buford's age were to have separation of the epiphysis in the upper femur as he did, and were to walk around on it without any care or support, can you tell us what effect, if any, it would have on him so far as the formation of callus is concerned at the site of the separation?" The witness replied: "It would eventually unite, but there would be more distortion in relation of the hip to the neck—more deformity." When asked his opinion as to the cause of the destruction of the bone in the head and neck of the femur, another expert testified: "My opinion is that

this boy was permitted to walk upon his right leg, that thereby it would cause more or less of a wearing or destruction of the fragmented end of the neck of the femur, which would cause shortening of the bone.'' The testimony is sufficient to sustain the court's finding that defendant's negligence was the proximate cause of the damage suffered by plaintiff for which an award was given.

The facts of this case bear a striking similarity to the facts in *Rankin* v. *Mills*, 207 Cal. 438 [278 Pac. 1044]. The Rankin case involved an action to recover for defendant's malpractice in failing to diagnose (no X-ray was taken) and treat plaintiff's fractured hip. It was proved that as a result of the failure to treat the injury the bone had made an abnormal, fibrous union, the leg was shortened and it was too late to secure a bony union. Evidence was introduced on behalf of defendant to the effect that due to the age of plaintiff, a bony union was very unlikely under any form of treatment and that in most cases such a fracture would result in the patient becoming crippled for life regardless of the treatment used. In affirming the judgment in favor of plaintiff the court accepted testimony of plaintiff's expert witness to the effect that the end result would not have been the same if the fracture had been properly treated.

It is argued that the finding as to proximate cause cannot be sustained for an additional reason. Defendant contends that since plaintiff's glandular deficiency might have caused the epiphyseal separation without the intervention of any trauma and since the end result could have been the combined result of several factors, there is no proof as to what proportion of the total damage was caused by his negligence. This contention cannot be sustained, for defendant was not charged with having caused the epiphyseal separation, recovery being sought only for the damages resulting from his negligent failure to discover and treat the separation. The chief importance of the precise cause of the separation lies in the fact that it might be shown to prove that the separation occurred while plaintiff was under defendant's care. The fact that the glandular deficiency or other factors may have contributed to the ultimate damage suffered by plaintiff cannot free defendant from liability. ''One who contributes to damage cannot escape liability because the proportionate contribution may not be accurately measured.''

(*City of Oakland* v. *Pacific Gas & Electric Co.*, 47 Cal. App. (2d) 444 [118 P. (2d) 328].)

█ The action of the trial court in overruling defendant's objections to questions asked of plaintiff's expert witness Dr. Herbert Judson is assigned as error. The witness was asked if he had seen cases of the separation of the epiphysis in boys between 12 and 16 years of age, overweight, and suffering from glandular disturbances and what the effect of proper treatment and proper diagnosis had been in those cases. The question was subject to criticism in that certain elements present in plaintiff's case were not included and for the reason that proper treatment and proper diagnosis were not defined. However, there was other substantial evidence properly admitted which was sufficient to sustain the findings of the court. It is not reasonable to conclude that the court was in anywise misled or that any other findings would have been made if the question had been free from criticism.

█ It is next contended that in permitting another of plaintiff's experts to state his opinion as to the time when the epiphyseal separation occurred, which he stated to be on the day of the automobile accident, the witness was allowed to invade the province of the court by testifying to the ultimate fact in issue. Defendant has not cited any authority which holds that an expert witness may not state his opinion, based on proven facts, as to the time when an injury occurred. The questioned testimony was manifestly introduced for the purpose of proving that the separation could have existed while plaintiff was under defendant's care. The court did not err in admitting it.

At the conclusion of the trial plaintiff was permitted to amend his complaint by changing the date of the termination of defendant's employment from July, 1938, to October, 1938. It is now contended that there was no evidence to justify the amendment. The record discloses ample evidence that defendant continued to treat plaintiff until October, 1938. The court did not abuse its discretion in permitting the amendment.

█ The action of the trial court in rejecting defendant's offer to prove that during the period from December 20, 1937, to February 1, 1938, he caused forty-one X-rays to be taken of various other patients, is assigned as error. Whether defen-

dant believed in the use of X-rays or had taken X-rays of other patients was not in issue. The proffered testimony was therefore not material and was properly excluded. The fact that defendant may have exercised ordinary care by taking X-rays of forty-one other patients has no bearing on the issue of negligence in the present case and cannot controvert the conclusive proof that he failed to take an X-ray of plaintiff's hip.

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.