[Civ. No. 13077.   Second Dist., Div. Three.   Sept. 18, 1942.]

ARMANDO CONTRERAS, a Minor, etc., et al., Appellants, v. DR. E. A. GUMMIG, Respondent.

422

Walter Powers and Stephen Monteleone for Appellants.

W. I. Gilbert, Jr., for Respondent.

WOOD (Parker), J. — Plaintiff Juana Contreras is the widow of Angel Contreras. The eight other plaintiffs are infant children of Angel Contreras, deceased, and appear herein by their guardian *ad litem,* Juana Contreras. As the heirs at law of said deceased, the plaintiffs commenced this action for damages for the wrongful death of Angel Contreras allegedly resulting from malpractice by defendant, a

physician, in rendering medical treatment to him. Judgment, based upon a directed verdict, was for defendant and plaintiffs appeal therefrom.

When the plaintiffs concluded their evidence the defendant rested his case, did not offer any evidence, and made a motion for a directed verdict upon the following grounds: (1) that no claim, as provided by law, was filed with the defendant, who was an employee (emergency surgeon) of the city of Pasadena; (2) that the cause of death was acute alcoholism, myocarditis and arteriosclerosis; and (3) there was a failure of proof that defendant did not exercise the ordinary degree of care and skill exercised by physicians and surgeons in the community at that time, and that there was a failure of proof that such negligence, if any, was a proximate cause of the death. The motion was granted.

Respondents concede that under the decision in *Jackman* v. *Patterson*, (1940) 42 Cal. App. (2d) 255 [108 P. (2d) 682], there was no requirement that plaintiffs should file a claim with defendant. That case held that the statute (Act 5150, as amended, 1937, Deering's Gen. Laws) upon which defendant relied in asserting that the filing of a claim was necessary was unconstitutional insofar as it related to the kind of claim involved herein.

Viewing the evidence in the light most favorable to plaintiffs as the court is required to do in considering a motion for a directed verdict the following appears:

In response to a call for an ambulance of the city of Pasadena, the defendant, a surgeon at the emergency hospital of that city, went in an ambulance on November 25, 1938, about 10 p. m., to a place in that city where Angel Contreras, sitting on a street curb, was having, according to defendant's testimony, "a profuse nasal hemorrhage" and "had blood smeared all over his clothing and face." While the defendant was there, about five minutes, a spot or pool of blood about 20 inches in diameter was in the gutter in front of Contreras and blood was running out from the edge of the curbing. Defendant did not treat Contreras at the curb scene, but, with assistance of the ambulance driver, put him in the ambulance and took him to the emergency hospital. Defendant did not ask Contreras any questions, or attempt to get a history of his injuries, at the curb or at the hospital. Contreras had a bruised face and nose. He was 45 years of age. (Contreras was a Mexican, was intoxicated, and had

an odor of alcohol on his breath. It did not appear whether he was able to speak English.)

Defendant looked with his "naked eye" into Contreras' nostrils to see from what portion of the nostrils the blood was coming, but did not do anything to determine whether it was coming from the anterior. After arriving at the hospital, defendant spread the nasal openings with a speculum and packed tightly in each nostril about two yards of gauze an inch wide soaked in adrenalin. About 10 minutes thereafter, Contreras having pulled the first packing out and started to bleed, defendant packed the nostrils again in the same manner and fastened the gauze in by putting adhesive tape across the nostrils.

In a conversation with defendant, a police officer "suggested to Dr. Gummig that the man (Contreras) be given further hospitalization and taken to the hospital," and defendant said they would not accept him at the hospital and it was "all right to put him in jail." Contreras then was put in the "drunk tank" in jail. About 12:45 a. m., the jailer noticed that the packing was out of Contreras' nose, he had "bled a pool of blood" about 12 inches in diameter on the jail floor in about 30 minutes, and he took him to the emergency hospital again. Defendant repacked his nostrils in the same manner as on the two previous occasions, did not make any inquiry of anyone concerning when he started to bleed and did not make any physical examination of him. He was taken back to jail about 1:30 a. m., and handcuffs with a long connecting link were put on him which held his hands down to the rear. He was placed in a sitting position on the floor and propped up in a corner. About 3:30 a. m. he was perspiring. At 4:15 a. m. he was dead, in the same sitting position with the manacles on. At the first and last packings he was given a hypodermic of 1/6th of a grain of morphine.

A duly licensed physician and surgeon, who had practiced in California since 1922, was called as a witness by plaintiffs and qualified as an expert in the treatment of nasal hemorrhage. He was asked a hypothetical question based upon assumed facts, justified by and embodied in the evidence concerning the condition and medical treatment of Contreras. In that hypothetical question he was asked whether or not the doctor exercised that degree of skill, care and learning usually exercised by a surgeon in the same or similar community under the same or similar circumstances.

In answer to such question he stated, "He did not exercise the ordinary degree of skill and care."

As reasons for his opinion, he stated: that when the hemorrhage started again about midnight and the patient was brought to the doctor for the third packing, the usual practice under such circumstances was to determine the extent of the bleeding which preceded the treatment because the less blood the patient has, the poorer his resistance is, and the more likely injuries may result to the functioning parts of the body; that the heart tries to make up for the loss of blood pressure by increasing its beat, the blood pressure gets less and less, and the heart tries to get faster and faster; that the loss of blood when chronic myocarditis is present would be the same as over-exertion or any tremendous amount of work thrown upon a heart muscle and it would have a "probable effect and [on] his death"; that the usual practice in packing the nose when the doctor first sees a nasal hemorrhage is to put in the plug or pack it back with ordinary gauze, but if it is not effective and the patient continues to bleed something must be inserted behind "in which to pack because the mere fact that you did not stop the hemorrhage proves that the first method was not good enough"; that when the packing was out about midnight and the patient had bled a quantity of blood covering a space of 12 inches in diameter on the floor within 30 minutes, the usual method is to plug up the posterior part of the nose by introducing a catheter through the nose, to which a string is attached, then a large piece of gauze, usually roll bandage, is attached to the string and the string is pulled so "the plug is pushed into the back part of the nose so that it gives something against which you can effectively put pressure" necessary to stop the bleeding vascular surface; that the usual method of examining the nose to determine the place from which the blood is coming is to insert a speculum into the nose and with reflected light, from a head mirror with a hole in the center, look parallel with the reflected light into the nose; that the usual practice when the source of the bleeding is located is to apply chromic acid thereto which causes a solid area to develop so bleeding stops; that the usual practice is to inject some substance to increase the coagulate ability of the blood; that adrenalin applied to the nostrils causes a contraction of the small blood vessels and is a temporary means of treatment, lasting about ½ hour.

The autopsy surgeon testified that the cause of death was chronic myocarditis and that the deceased also had arteriosclerosis; that he had a soft flabby heart that showed definite myocardian degeneration; that he could not determine from the autopsy whether he had had a hemorrhage; that he did not examine his bowels or stomach to see whether blood was in them.

The above evidence was that most favorable to plaintiffs. No evidence was offered by defendant. Plaintiffs were entitled to the benefit of all reasonable inferences to be drawn from the evidence. Defendant knew when he was at the street curb that Contreras was having a profuse nasal hemorrhage. It was reasonable to infer that defendant knew by reason of the amount of blood on the street, on Contreras' face, and on his clothing, that Contreras had lost considerable blood before defendant arrived at the curb scene.

A qualified medical expert testified that the defendant did not exercise the ordinary degree of skill and care exercised by surgeons in that community in the treatment of such a hemorrhage.

Defendant examined the nostrils with the ''naked eye'' to locate the source of the bleeding. If he did locate such source, he did not apply chromic acid on that area. He did not inject a substance to increase coagulation. When the second packing was out of the nostrils about midnight and Contreras, bleeding again, was brought to defendant for further treatment, defendant did not determine or attempt to determine the extent of the bleeding (which was the pool of blood 12 inches in diameter on the jail floor) which preceded his return. At that time defendant repacked the nostrils anteriorly in the same manner as he had packed them on two previous occasions.

The expert witness testified that the usual practice was as follows: (1) in locating the source of bleeding to insert a speculum into the nostrils, then with reflected light look therein; (2) to apply chromic acid to the area which was the source of the bleeding in order to cause a solid area to develop; (3) to inject some substance to increase coagulation; (4) upon return of the patient for repacking to determine the extent of the bleeding which preceded such return; and (5) when the doctor first saw the patient, to pack the nostrils anteriorly with ordinary gauze, but if that packing did not prove effective then to pack the nostrils posteriorly with a large piece of gauze, usually roll bandage.

It therefore appears from the expert's testimony, adopting the view most favorable to plaintiffs, that the defendant did not follow the usual practice in at least four respects: he did not use the speculum to locate the bleeding area; he did not apply chromic acid to that area; he did not inject a substance to increase coagulation; and he did not attempt to determine the extent of the bleeding which preceded the return of the patient.

Whether the defendant, in packing anteriorly instead of posteriorly when the patient was returned, failed in a further respect to follow the usual practice, as stated by the expert, depends upon the fact whether or not the prior packing was effective.

Defendant asserts that the expert's testimony did not condemn the method used by defendant for the reason he said that anterior packing was proper in the first instance, but if it did not prove effective and the bleeding continued then posterior packing was required; that it was not shown that the packing was not effective; that the bleeding continued not because the method of packing was ineffective, but for the reason the packing was removed by Contreras.

It is not a necessary conclusion that Contreras removed the packing which was in prior to his return to defendant. Although the jailer (who was not present when the packing was removed or came out) testified that Contreras "had pulled the packing out," the competent testimony by the jailer was that a "piece of packing" was hanging to Contreras' nose and he was "still in that position" (referring to Contreras as he sat at a table with his head in such a position that the jailer "lifted his head up" in order to "see him").

A pool of blood 12 inches in diameter was upon the jail floor. It may have been there because the anterior packing was not effective or because Contreras or someone removed the packing or interfered with it.

If the packing was not removed or interfered with by Contreras or anyone, the fact that the amount of blood indicated above had accumulated on the jail floor would be some evidence that the packing was not effective and that a posterior packing should have been used when Contreras was returned for a repacking of the nostrils. Whether the packing was removed or interfered with was a question of fact.

If the packing was not removed or interfered with by

anyone and nevertheless it came out, the fact that it came out and the bleeding continued would be some evidence that the anterior packing was not effective and that a posterior packing should have been used in the repacking to give, as stated by the expert, "something against which you can effectively put pressure necessary to stop the bleeding vascular surface." Whether the packing came out even though no one interfered with it was a question of fact.

The medical expert testified that adrenalin, in which the packing used by defendant was soaked, caused a contraction of the small blood vessels and that it was a temporary treatment which lasted about ½ hour. If the blood accumulated on the jail floor after the adrenalin had lost its effectiveness and while the packing remained in the nostrils, those facts would be some evidence that the packing was not effective. Whether the packing was effective only while the adrenalin was effective was a question of fact.

It does not appear that defendant, at the time of repacking or at all, made any inquiry, or that he was informed, concerning any happenings in the jail which would be a factual basis for determining whether the prior packing was effective or whether he should use a posterior packing.

Relative to the question whether or not the anterior packing was effective, the testimony presented questions of fact for the jury as above indicated.

The determination of those questions would be the basis for determining the further question of fact whether the anterior packing was effective. If it should be determined it was not effective then a further question of fact would be presented, namely, whether the defendant should have used a posterior packing when Contreras was returned to defendant for repacking of the nostrils.

Irrespective of the question of fact concerning anterior or posterior packing, however, questions of fact for the jury in addition thereto were presented, as above stated, by the testimony of the expert as to whether defendant failed to follow the usual practice in not using the speculum to locate the source of bleeding, in not using chromic acid, in not injecting coagulation substance, and in not attempting to determine the extent of the bleeding which preceded the repacking.

The statement in *Nelson* v. *Painless Parker,* (1930) 104 Cal. App. 770, 774 [286 Pac. 1078], is applicable here: "But as has been said heretofore, there was some testimony of

experts relative to what should have been done by the operating dentist, and it was for the jury to determine the facts."

It therefore appears that a prima facie case of negligence was established.

Defendant claims there was no evidence, if the defendant was negligent, that the negligence contributed proximately to the death. The argument of defendant is that if defendant should have packed decedent's nostrils posteriorly when he was returned for repacking, that his failure so to pack them could not have been a proximate cause of death; that the loss of blood covering areas 20 inches in diameter and 12 inches in diameter occurred prior to the time the expert said a posterior packing was indicated, namely, prior to the time he was returned for repacking; that under the expert's testimony the proximate cause of death was the loss of blood that had already occurred before repacking; that the autopsy surgeon said the cause of death was chronic myocarditis; and that no causal connection was shown between the treatment and the death.

The expert testified that when chronic myocarditis is present a hemorrhage would have an effect on the heart the same as over-exertion or any tremendous amount of work thrown upon a heart muscle, and it would have "a probable effect and (on) his death." He said in giving his reasons for that opinion: "When the general blood pressure falls below a certain level, the heart muscle itself is one of the first tissues to feel that, and the circulation of the heart muscle is naturally very indispensable to the contractions of the heart muscle itself." He also said concerning the heart: "When you have hemorrhage any place in the body the heart first tries to make up for the loss of blood pressure which is necessary for tissues to function, by increasing its beat. One of the first signs of hemorrhage, in other words, is an increase of pulse rate, and a vicious circle starts, because if the point of bleeding is not checked then, of course, the blood pressure gets less and less, and the heart tries to get faster and faster."

In the case of McBride v. Saylin, (1936) 6 Cal. (2d) 134 [56 P. (2d) 951], plaintiff was struck in the eye by a nail head and lost his sight in that eye. Defendants, who were physicians, rendered medical treatment to plaintiff for the injury but did not remove a piece of steel from the eye. Later the steel was removed by other physicians. The action

was for damages for malpractice. A medical expert called by plaintiff testified that the loss of sight was caused by the entrance, presence and removal of a foreign body; that the removal had nothing to do with the loss of vision, and that the length of time the particle stayed in the eye contributed considerably to the loss of vision. The court said at page 139, " '. . . the evidence establishes sufficiently at least for a *prima facie* case, that . . . lack of' professional 'care' and skill 'was the proximate cause of the loss of sight. "If . . . it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science." (*Dimock* v. *Miller,* 202 Cal. 668, 671 [262 Pac. 311].)' "

In *Sim* v. *Weeks,* (1935) 7 Cal. App. (2d) 28 [45 P. (2d) 350], the action was for damages for malpractice. Defendant, a physician, reduced a bone fracture in plaintiff's arm. Paralysis, caused by the impairment of the blood circulation, developed in the arm. Defendant claimed the evidence was not sufficient to establish a causal connection between the treatment and the paralysis. A medical expert called by plaintiff testified that the elbow joint had been flexed as far as it could possibly go under pressure, that the bandage was too tight, and the treatment in that regard was not usual when measured by the requisite standard. In quoting from another case the court said at page 38: " 'Upon the issue of whether defendants were guilty of malpractice . . . the expert could and did give opinion evidence. . . . When a result may or may not be occasioned by malpractice, an expert medical witness invades the province of the jury when permitted to go beyond stating that it *could* and in saying that it *did* occasion the result. Such an opinion is but the private judgment of the witness and not competent evidence. Whether the alleged malpractice could occasion the result complained of was one of science only. Whether malpractice did occasion such result was in controversy, and therefore not one of mere science. . . . But, when a result could have been occasioned by one of two or more causes, the ultimate fact of which cause occasioned the result is for determination by the jury, and a medical expert may not, in case of conflicting evidence, *invade* the province of the jury and testify that the result was in fact occasioned by one cause only.' An expert should not be permitted to express an opinion as to an ultimate fact which is to be decided by the jury."

There was no conflicting medical expert testimony herein. The expert called by plaintiff testified that such a loss of blood would have a probable effect on Contreras' death. The evidence established sufficiently for a prima facie case a causal connection between the treatment and the death. The question of proximate cause was for the jury to determine.

Appellants (plaintiffs) contend further that the court erred in sustaining objections to certain questions which plaintiffs asked the autopsy surgeon, and in sustaining an objection to an offer of proof. The witness stated that the autopsy showed that death was caused by chronic myocarditis. He said he could not determine from the autopsy whether decedent had suffered a hemorrhage.

Thereupon plaintiffs asked the autopsy surgeon the following question: "Now, doctor, assuming that this man had a profuse nasal hemorrhage previous to his death, what in your opinion would the hemorrhage—what effect, in your opinion, would that hemorrhage have on the man who had the heart condition that you determined that this man had from your autopsy?" An objection was made to this question on the ground that the witness had not said that he had an opinion. The trial judge then stated that if plaintiffs would include in the facts assumed in the question that the amount of blood was unknown, he would overrule the objection. The question was supplemented by plaintiffs to include the additional fact suggested by the court. The witness then said that he had an opinion. He was asked: "What would be the opinion?" The answer was: "The opinion would be if he lost a large amount of blood. . . ." The answer was not completed apparently for the reason that defendant's counsel interrupted and made a motion to exclude the answer. The witness then stated: "You must know at least in a relative manner about the amount of blood before you can draw an opinion." He then was asked: "Well, what, if any effect would the loss of blood have on a heart condition of this kind, assuming that in addition to losing blood within a half hour covering an area of 12 inches, he had previously within a period of about three hours lost blood which showed an indication of about 20 inches in diameter?" The trial judge then said: "I think the witness has answered the question. You gave him the hypothesis and he says without knowing the amount of blood he cannot answer the question, so—was I correct in that?" The witness said, "Yes, sir." Counsel

for plaintiffs then asked the following questions to which objections were sustained: "I want to know, doctor, not knowing the extent, I want to know whether or not in certain cases a hemorrhage would have an effect upon a heart of this kind?" and "How much bleeding is necessary before the bleeding will have an effect on a heart, in the condition of this man's heart?" Plaintiffs then made the following offer of proof to which an objection was sustained: "We offer to prove by this witness that where a person has chronic myocarditis as was determined to have existed in the case of Angel Contreras by this witness in the performance of an autopsy, a profuse nose bleed or hemorrhage of an extent which will cover an area of 12 inches of a floor space, regardless as to the depth or density of the blood, within a period of half hour, it would have a detrimental effect on the man's heart, and that effect would in all probability result in his death."

Plaintiffs were entitled to present for the consideration of the jury the extent of the knowledge the autopsy surgeon had upon which he based his conclusion. They were entitled also to present to the jury his opinion as an expert whether he would have arrived at a different conclusion as to the cause of death if he had known that decedent suffered a hemorrhage. Those questions and the offer of proof should have been allowed.

The judgment is reversed.

Schauer, P. J., and Shaw, J. pro tem., concurred.

A petition for a rehearing was denied October 17, 1942, and the following opinion was thereupon rendered:

THE COURT.—The respondent, in his petition for rehearing, asserts that "the evidence is, however, precisely to the effect that no such additional bleeding occurred" after the last packing of Contreras' nostrils, and contends that, in the absence of such evidence, any negligence of which respondent may have been guilty in making that packing is not shown to have been the proximate cause of Contreras' death. In this case, however, there was sufficient evidence of negligence resulting in bleeding, irrespective of the last packing, to require a submission of the case to the jury. In support of his statement that "no such additional bleeding occurred," respondent refers to testimony of Contreras' cellmate as follows: "Q. Did you see any blood on him or

around him at that time [referring to the time after the last packing when the cellmate awoke and Contreras was dead] ? A. No.'' (Tr. p. 35.) It is true that he did so testify, but it is also true that prior thereto he testified as follows: ''A. I know that they took him to the hospital down below, and I went to sleep. I don't remember when they returned him. Q. Did you wake up and see Contreras afterward? A. Yes.'' (Tr. p. 28.) ''Q. By Mr. Monteleone: Now, did you observe his appearance at that time [referring to the time after he was taken to the hospital] when you woke up? A. Yes. Q. Describe what his appearance was as you observed it? A. He was standing up like this (indicating), and he had very much blood on his face, along here (indicating). Q. You say his hand was this way (indicating), did he have anything—were his hands tied? A. Yes. Q. Did you see what it was tied with? A. With manacles.'' (Tr. p. 29, 30.) Contreras was taken to the hospital from jail only one time and that was when the last packing was made. The manacles were on Contreras only after he returned to jail after the last packing. A jailer testified that the handcuffs were put on Contreras after he was ''brought back up'' from the hospital. (Tr. p. 90.) It therefore appears that after the last packing there was testimony that Contreras ''had very much blood on his face.'' The reference by respondent to testimony that the cellmate did not see any blood on Contreras after the last packing, and the reference herein to the further testimony that he did see blood on Contreras' face after the last packing are, obviously, inconsistent. The court is required, however, to adopt the view most favorable to plaintiffs, which is that blood was on Contreras' face after the last packing. Of course, in a case like this, where the cause of death is definitely fixed as being excessive bleeding, negligence of the attending physician which does not result in bleeding cannot be regarded as a proximate cause of death and proof that it did so result is part of the burden cast on plaintiff. The jury might, however, have resolved the conflict in the evidence above quoted favorably to plaintiff and found that there was bleeding after the last packing.

The petition for rehearing is denied.

Schauer, P. J., Wood (Parker), J., and Shaw, J. pro tem., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 12, 1942.