**William JAMES and Kathryn James, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. C–79–1833–WWS.**

United States District Court, N. D. California.

Jan. 16, 1980.

John P. Caudle, Kincaid, Gianunzio, Caudle & Hubert, Oakland, Cal., for plaintiffs.

John F. Barg, Asst. U. S. Atty., San Francisco, Cal., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OF OPINION

WILLIAM W SCHWARZER, District Judge.

■ This is an action for personal injury brought under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* The Court has jurisdiction under 28 U.S.C. § 1346(b). The law of California, the place where the complained of acts occurred, controls. *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *United States v. English,* 521 F.2d 63, 65 (9th Cir. 1975).

Plaintiff William James complains that defendant negligently failed to inform him of the discovery of a suspected tumor in the course of a pre-employment physical at the Mare Island Naval Shipyard in December, 1976. James claims that as a result he was deprived of a measurable chance of an increased life expectancy through early removal or treatment of the tumor, which was inoperable when discovered almost two years later. Plaintiff Kathryn James, his wife, claims a consequential loss of income and consortium.

The Court has heretofore granted partial summary judgment to plaintiffs on the issue of negligence. A trial was held to the Court on the proximate cause and damage issues on December 26, 1979. The following shall constitute the Court's findings of fact and conclusions of law on all issues.

## FACTS

In December, 1976, William James, then 38 years old, applied for a position as marine machinist at the Mare Island Naval Shipyard. As a condition of employment, he was required to take a physical examination at the Mare Island dispensary. A chest X-ray taken in the course of the examination was routinely sent to Oak Knoll Naval Hospital for review. The reviewing radiologist at Oak Knoll noted an abnormality "in the right para tracheal region, in which there is a 3 x 2 cm. soft tissue density." He expressed his concern about a possible cancer and requested further chest X-rays for review and a possible workup. Through a clerical error, both the December, 1976, X-ray and the radiologist's report were inadvertently filed without being seen by the examining physician at Mare Island. James was not informed of the abnormality appearing on his chest X-ray and was hired by the Mare Island shipyard. He worked there until October, 1978, when he began to experience chest pains, shortness of breath and coughing, and sought treatment from his personal physician.

The X-rays taken at that time revealed a large mass in James's right lung. Exploratory surgery disclosed a large cell undifferentiated carcinoma located in the lung and the mediastinum, close to the trachea (windpipe). The mediastinum is the area between the lungs, extending from the neck to the diaphragm, in which are located the trachea and esophagus, major arteries and veins and the heart. It is undisputed that a cancer which has invaded the mediastinum is inoperable.

James received radiation therapy in November and December, 1978. At the time of trial, the tumor had shrunk in size so as to be invisible on X-rays. The cancer had gone into remission and there was no direct evidence that it had metastasized (i. e., spread). James had regained the weight he had previously lost and was physically able to return to work.

## NEGLIGENCE

At the threshold, we confront the issue whether the United States owed a duty of care to James in connection with the pre-employment physical examination. The government argues that the absence of a physician-patient relationship here precludes such a duty.

California law does not employ such a categorical test. Instead, it proceeds from the principle that all persons owe a duty of ordinary care to prevent others from being injured as a result of their conduct; any departure from this principle involves a balancing of several considerations, such as the foreseeability of harm to plaintiff, the degree of certainty that plaintiff suffered injury, the closeness of the connection between the conduct and the injury, the moral blame attached to defendant's conduct, the policy of preventing future harm, the relative burden on the parties, and the availability of insurance. *Keene v. Wiggins*, 69 Cal.App.3d 308, 138 Cal.Rptr. 3, 6 (1977).

In this case, these considerations on balance favor plaintiffs. It was foreseeable that an inadvertent failure to advise plaintiffs of the apparent tumor disclosed by the X-ray would cause harm to James and some harm did in fact result. Policy considerations favoring the imposition of the consequences of negligence on the party best able to prevent it, and the relative burden on the parties support the imposition of a duty here, even in the absence of moral blameworthiness.

While the court in *Keene v. Wiggins* imposed no duty on the physician under the facts of that case, those facts are distinguishable. Plaintiff there was a workers' compensation claimant who allegedly had relied to his detriment on the report of the carrier's examining physician that no surgery was needed. The court concluded that the physician owed no duty to plaintiff where the physician had been employed by the carrier to rate the injury, stood in an adversary relationship to plaintiff, and had no reason to expect that plaintiff would rely on his report.

A case closely in point here is *Coffee v. McDonnell Douglas Corp.*, 8 Cal.3d 551, 105 Cal.Rptr. 358, 503 P.2d 1366 (1972). There plaintiff had taken the pre-employment physical examination required by defendant, was told that he had passed it, and was employed. Seven months later he began to suffer symptoms which led to a diagnosis of multiple myeloma (cancer of the bone marrow). A blood sample taken during the physical examination had been sent to an independent laboratory whose report, when received by defendant, had been filed without being seen by the examining physicians. The report showed an abnormally high sedimentation rate which, had it been known to the physicians, would have led them to make further inquiries. The California Supreme Court held that although an employer generally owes no duty to prospective employees to ascertain whether they are physically fit for the job they seek, where he assumes that duty he is liable if he performs it negligently. The court agreed with the defendant employer that it was under no duty to discover diseased conditions, but held that it may nevertheless be held liable for not discovering a disease if, in light of the circumstances, it failed to conduct the examination with due care. The inadvertent filing by defendant of the required blood test report before it was seen by the examining physicians was a failure on the employer's part to exercise due care. The *Coffee* case was followed in *Betesh v. United States*, 400 F.Supp. 238 (D.D.C.1974), decided under Maryland law. Betesh was rejected by the army without explanation following his pre-induction physical. He had had a prior knee injury and had with him at the examination a note from a private physician to avoid vigorous physical activity. Unbeknownst to him, however, an X-ray taken during the examination showed an abnormality which, as noted in the official file, was the ground for his rejection, but was never disclosed. Six months later Betesh accidentally discovered this notation in the file and promptly saw his doctor who diagnosed Hodgkin's disease (cancer of the lymph glands). The court

concluded that the government had breached its duty in failing to disclose to Betesh the abnormal condition shown on the X-rays.

■ The reasoning of the *Coffee* decision is dispositive here. Defendant had no duty to discover James's tumor. Having made a chest X-ray an essential part of the preemployment examination to determine an applicant's physical fitness, however, defendant failed to use due care when, through a clerical error, the report on the X-ray was not brought to the attention of the examining physician.[1]

### PROXIMATE CAUSE

■ Plaintiffs must prove by a preponderance of the evidence that the injury for which they seek damages was proximately caused by defendant's breach of the duty it owed plaintiffs. Cal.Civ.Code, § 3333. In a case such as the one at bench, where the diseased condition is the result of other causes, the evidence must show that defendant's conduct placed plaintiffs in a position worse than that in which they would otherwise have been. *Deckard v. Sorenson*, 177 Cal.App.2d 305, 2 Cal.Rptr. 121 (1960). Plaintiffs need not prove causation conclusively, however, or even to a certainty; it is sufficient if a preponderance of the evidence establishes a reasonable probability that defendant's negligence caused plaintiffs to be worse off. *Burford v. Baker*, 53 Cal.App.2d 301, 306, 127 P.2d 941 (1942); *Contreras v. Gummig*, 54 Cal.App.2d 421, 430–31, 129 P.2d 18 (1942); *Keen v. Prisinzano*, 23 Cal.App.3d 275, 100 Cal.Rptr. 82 (1972). Evidence which shows to a reasonable certainty that negligent delay in diagnosis or treatment increased the need for or lessened the effectiveness of treatment is sufficient to establish proximate cause. *Cullum v. Seifer*, 1 Cal.App.3d 20, 81 Cal. Rptr. 381, 385 (1969); *Carrasco v. Bankoff*, 220 Cal.App.2d 230, 33 Cal.Rptr. 673, 680 (1963). *See also, Hicks v. United States*, 368 F.2d 626 (4th Cir. 1966) (proximate cause established by proof that negligence destroyed "reasonable possibility" of rescue). Notwithstanding some seeming semantic variations in the cases, it is clear enough that once plaintiffs have proved defendant's negligence, evidence which shows the causal relationship to the claimed injury to have a reasonable medical basis, as opposed to being mere conjecture, will suffice. *Cullum v. Seifer, supra*, 81 Cal. Rptr. at 385. In this case, analysis of the proximate cause issue must focus on a range of possible consequences of defendant's negligence.

James contends that defendant's negligent failure to disclose the 1976 X-ray findings caused him to lose a statistical 10–15 percent chance of survival for five years. The expert witnesses of both sides agreed, however, that this statistical chance of survival is premised on the tumor being resectable (i. e., operable). They further agreed that once the tumor has invaded the mediastinum it becomes inoperable.[2]

The single X-ray taken in December, 1976, which affords only an incomplete two dimensional view of the tumor, is insufficient to support a definitive judgment on whether the tumor at the time had invaded the mediastinum. Both of plaintiffs' expert witnesses were of the opinion, however, that more probably than not, the tumor was in the mediastinum at the time. Defend-

---

1. The government also argues that the failure to inform James of the abnormal X-ray falls within the misrepresentation exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(h). The gravamen of the action, however, is not a false statement but the negligent performance of operational duties. *Betesh v. United States, supra*, 400 F.Supp. at 241, note 2; *Ramirez v. United States*, 567 F.2d 854 (9th Cir. 1977) (en banc). Compare, *Hoesl v. United States*, 451 F.Supp. 1170 (N.D.Cal.1978) (claim against psychiatrist who, following preemployment examination of plaintiff, communicated false diagnosis of mental illness to plaintiff's supervisor fell within misrepresentation exception).

2. In 1978 James's tumor was diagnosed as being a large or squamous cell type, and not a small cell tumor. In all probability, it would have been of the same type in 1976. Unlike small cell tumors, large or squamous cell tumors, depending on their location, are operable. Thus, resection could not have been ruled out by reason of the cell type involved.

ant's expert agreed, and further believed that the tumor's location in the upper right bronchus, immediately adjacent to the trachea, would in any event have made surgery infeasible. The Court therefore concludes that plaintiffs have failed to sustain their burden of proving to a reasonable certainty that the tumor was operable in 1976, a condition to finding that James had a 10–15 percent chance of surviving five years.

Plaintiffs contend that defendant cannot contest the measure of James's chances for survival, but must bear any uncertainty in proof which its negligence has caused. But existing authority for such a proposition requires plaintiffs to prove, at a minimum, that defendant actually destroyed a substantial possibility of survival, which they have failed to do in this case. *Hicks v. United States, supra,* 368 F.2d at 632. Nor can plaintiffs rely on *Cullum v. Seifer, supra,* 81 Cal.Rptr. at 385, in which the court recognized that the uncertainty with respect to proof was caused by defendant's negligence and allowed an inference, in the absence of contrary evidence, that plaintiff's condition fell within that group where prompt treatment would have improved her prognosis. Here, plaintiffs' own experts testified that the tumor was probably not resectable in 1976 and therefore any inference of operability would be improper.

Plaintiffs' failure to establish the premise for the loss of a statistically measurable chance of survival does not, however, rule out recovery. An individual may be compensated for any aggravation of his injury or shortening of his lifespan proximately caused by the defendant's negligence, even though other factors contributed to or caused the initial condition. *Coffee v. McDonnell Douglas Corp., supra,* 105 Cal. Rptr. at 361, 503 P.2d 1366, (had multiple myeloma, an incurable disease, been diagnosed earlier the plaintiff would not have suffered the extent of the injuries he did); *Armstrong v. Svoboda,* 240 Cal.App.2d 472,

49 Cal.Rptr. 701, 704 (1966) (earlier hospitalization would have minimized plaintiff's heart damage); *Burford v. Baker, supra,* 53 Cal.App. at 307, 127 P.2d 941, (bone deformity would probably not have developed if early recognition of the condition had occurred). Plaintiff may demonstrate the benefit of earlier treatment in his case by relying on general theories of appropriate medical treatment. *Keen v. Prisinzano, supra,* 100 Cal.Rptr. at 85–86, (early use of the pinning method in treating fractured joints generally reduces the residual effects which plaintiff, who did not receive such treatment, exhibited at trial); *Cullum v. Seifer, supra,* 81 Cal.Rptr. at 385, (early treatment of lymphosarcoma—cancer affecting the lymphatic system—can generally isolate the disease in one place, reduce plaintiff's suffering, and improve the longterm prognosis); *Carrasco v. Bankoff, supra,* 33 Cal. Rptr. at 680, (better results are generally obtained in treating third degree burns by using skin grafts at an early stage of treatment).

Both sides' experts agreed that from a medical standpoint early treatment of cancer is preferable. The possibility that the tumor might have been operable in 1976 cannot be ruled out, even if plaintiff failed to establish it to a degree of certainty so as to bring into play statistically measurable chances of survival based on resection. James lost the benefit of that possibility, as well as the benefit of early radiation treatment which might have prevented or reduced the metastasis which, according to plaintiffs' experts, has probably occurred since 1976. The government's own expert stated that James's chance of survival would have been better had he first been treated in 1976 rather than 1978.

The government argues, in opposition, that James, having survived more than three years since the first discovery of the tumor, has already outlived the statistical forecast for ninety-nine percent of lung cancer cases.[3] Thus, the government con-

---

**3.** The testimony indicates that only five percent of all lung cancer cases survive as long as five years from diagnosis, nearly all of these being operable cases. A typical patient with inoperable lung cancer has an eight percent chance of surviving fifteen months with radiation treat-

tends, James could not reasonably claim to have been better off had a full diagnosis been made in December, 1976. This argument, however, is based on a misapplication of the survival statistics. The statistics are keyed to a survival interval from the time of the first definitive diagnosis of cancer. Speculation, even if reasonable, that James had lung cancer when the 1976 X-ray was taken is not a substitute for a definitive diagnosis. This point is driven home by the testimony of plaintiffs' witnesses that in 1976 the tumor may have been far less, and perhaps not at all undifferentiated (i. e., virulent). Plaintiffs' expert testified that there is a "high probability that the tumor shown by the 1976 X-ray was not an undifferentiated tumor, or if it was, it was significantly less undifferentiated than when diagnosed in October-November, 1978." He felt that if the tumor had been as undifferentiated in 1976 as it was in 1978, James would not have survived. James's treating physician expressed the same opinion. The government's expert did not contradict their opinions.

Inasmuch as the degree of undifferentiation of a tumor may increase over time, the government's attempt to apply survival statistics retroactively from a time when James's undiagnosed tumor may have been far less virulent is an unconvincing exercise. If indeed it was substantially less undifferentiated, James's survival would not necessarily place him so far off the curve that early treatment could not have conferred an additional benefit. Based on the tumor's size in 1978, plaintiffs' experts concluded that it had probably metastasized since 1976; earlier radiation treatment would have reduced its size and lowered the risk of metastasis.[4]

ments. Once lung cancer has penetrated into the mediastinum, the chances of survival are less than two percent.

4. Against this evidence must be weighed the opinion of the government's expert that radiation therapy seriously degrades the body's natural immune system. Early treatment commencing in 1977 would have adversely affected his natural ability to combat the cancer during

The Court therefore finds and concludes that plaintiffs have sustained their burden of proving that James would have benefited from early treatment, i. e., that discovery and disclosure in 1976 would have offered at least a chance that the tumor could be successfully treated and, even if not cured, its growth arrested or slowed. As a proximate result of defendant's negligence, James was deprived of the opportunity to receive early treatment and the chance of realizing any resulting gain in his life expectancy and physical and mental comfort. No matter how small that chance may have been—and its magnitude cannot be ascertained—no one can say that the chance of prolonging one's life or decreasing suffering is valueless. Accompanying this physical loss is the mental anguish from the awareness of this lost opportunity. Both are elements of damages for which James is entitled to compensation.

## DAMAGES

The fact of proximately caused injury having been proved, damages may be recovered even if they are not susceptible to accurate measurement. *Guntert v. City of Stockton*, 55 Cal.App.3d 131, 126 Cal.Rptr. 690, 703 (1976), *reh. den.*, 55 Cal.App.3d 131, 127 Cal.Rptr. 602. Although James's cancer is now in remission, the weight of the evidence is that it is almost certain to reappear in the not too distant future. Thus, for the reasons previously discussed, James is entitled to recover for the loss of the opportunity for earlier and possibly more effective treatment through the government's negligence. The Court finds that $35,000 represents reasonable compensation for this loss.

James also experienced mental suffering and anguish as a result of the government's negligence for the reasons discussed above.

the following twenty-one months during which he did successfully combat it. This consideration, while entitled to weight, is not decisive. As the witness himself stated, although one can "wonder whether Mr. James was not fortunate in not receiving early treatment", his chance of survival would have been better had he first been treated in 1976 rather than 1978.

Against this must be set off the psychological benefit from not having known of his cancer from December, 1976 until October, 1978. The Court finds that $25,000 represents reasonable compensation for this loss.

██ James is not entitled to recover lost earnings from the time he left his job in October, 1978 to the present. Although, as discussed above, timely diagnosis might have improved his subsequent condition, the proof is not sufficient to find that the government's negligence was a proximate cause (i. e., a substantial factor) in bringing about the condition which in October, 1978 required him to stop work.

██ Mrs. James is not entitled to damages for loss of support. Plaintiffs have failed to prove that defendant's negligence was the proximate cause of a measurable reduction in James's working life expectancy. Nor is she entitled to loss of consortium. To recover she would have to prove complete loss of consortium for a definite period of time, not merely the mental and emotional damages suffered as a result of injury to her spouse. *See, Park v. Standard Chem Way Co.*, 60 Cal.App.3d 47, 131 Cal. Rptr. 338 (1976); *Rodriguez v. Bethlehem Steel Corp.*, 12 Cal.3d 382, 115 Cal.Rptr. 765, 525 P.2d 669 (1974). In this case, moreover, the existence of the terminal illness appears to be the dominant cause of the impairment of the marital relationship, the impact of the government's negligence being relatively insignificant.

For the reasons stated, plaintiff William James is entitled to judgment in the amount of $60,000, plus costs.

IT IS SO ORDERED.