[Civ. No. 2659.   Fourth Dist.   Mar. 12, 1942.]

W. C. LINDSEY, Respondent, v. D. W. DE VAUX et al., Appellants.

W. M. Conley, Philip Conley, Matthew Conley and Conley, Conley & Conley for Appellants.

Louis J. Coelho and G. L. Aynesworth for Respondent.

SCHOTTKY, J. pro tem.—This is an appeal from a judgment based on a verdict in favor of respondent and from the order denying appellants' motion for judgment notwithstanding the verdict.

Respondent sued as the father of a minor son, Joe Lindsey, who was drowned in a swimming pool. The complaint, in substance, alleged that appellants were conducting a public swimming pool where admission was charged; that the State Department of Health rules provided that "One or more qualified lifeguards, having no other duty to perform at the time, shall be on lifeguard duty at each pool for which an admission or special use fee is charged, whenever the pool is open for public use. Lifeguards shall be in good physical condition and possess demonstrated proficiency in lifesaving"; that the appellants had employed a lifeguard but he was required to perform other duties; that on June 14, 1940, respondent's son, Joe Lindsey, was 11 years old and was inexperienced in swimming; that on said day he was admitted to appellants' swimming pool; that "the defendants failed and neglected to supervise, watch, and guard the swimmers in said swimming pool in that the defendants failed and neglected to have a lifeguard on lifeguard duty; and that by reason of defendants' requiring the said lifeguard to perform other duties at the times herein mentioned, and as a direct and proximate result thereof, said Joe Lindsey was negligently permitted to and did drown in said swimming pool."

Appellants' answer denied the allegations charging the negligence on their part and set up a defense of contributory negligence on the part of the deceased boy and also on the part of the respondent as father of the boy, and also set up

a defense that the boy was drowned as the proximate result of an unavoidable accident without negligence on the part of anyone.

The principal contention of appellants is that "there is no substantial evidence showing negligence or any causal connection between such alleged negligence and the death of the minor." It is a rule too well established to require the citation of authorities that, before an appellant tribunal is justified in reversing a judgment upon the ground of the insufficiency of the evidence, it must appear from the record that, accepting the full force of the evidence adduced, together with every inference favorable to the prevailing party which may be drawn therefrom, and excluding all evidence in conflict therewith, it still appears that the law precludes such prevailing party from recovering a judgment. The evidence must be construed most strongly against the losing party. Every favorable inference and presumption which may fairly be deduced from the evidence should be resolved in favor of the prevailing party. The prevailing party's evidence must ordinarily be accepted as true, and evidence which is contradictory must be disregarded.

The pool in question was 100 feet long east and west, and 35 feet in width north and south. As shown by the photographs introduced in evidence, there are no obstacles or obstructions in it. It is enclosed by buildings on the north and south sides, on the east by a high board wall and on the west by a wire fence. A low diving board is on the north half of the east end and a high diving board is on the south half of the east end. The entrance and the refreshment building are at the west end. It is apparent from an examination of the photographs that anyone standing at any point within the enclosure can see the entire pool. Bill Young, the lifeguard, was 16 years of age on the day of the drowning and wore swimming trunks, sandals, and dark glasses, and had zinc oxide on his nose, making it white, and had a string around his neck attached to a whistle. Joe Lindsey, the boy who was drowned, was 11 years of age and according to the testimony of his father and the witness Richard Actis, also aged 11, was not a good swimmer.

Mike Mitchell, also aged 11, testified he was also at the pool when a girl called his attention to Joe Lindsey and told him to go in. The following are excerpts from his testimony:

"A. I saw him, he was floating in the water with his head

up toward the water and his feet pointing down toward the bottom.

"Q. And what part of the pool was he in at that time?

"A. The diving—up towards the diving board end, and on the ladies' dressing room side. . . .

"Q. Just tell us what you did.

"A. I went in after him.

"Q. And what did you do and what did he do?

"A. Well, I was trying to get ahold of him and he pushed me down and I thought he was fooling, so I just let it go.

"Q. Now, did you make further effort to get him?

"A. Yes. After a while another girl told me to go in again, so I went in, and he didn't try to get me, so I just got out again.

"Q. Did you see him any more after that?

"A. Yes. When they were pumping the water out of him . . .

"Q. Did you know Joe Lindsay before that day?

"A. Yes, I knew him at school fairly well . . .

"Q. And you saw Joe there, of course, at the De Vaux pool?

"A. I saw him before—before I attempted to get him. I saw him swimming.

"Q. Saw him before. And you saw him down in the water there? A. Yes.

"Q. But this time that you told Mr. Aynesworth about, when you jumped in and then he pushed you down,—you didn't think there was anything the matter with him then, did you?

"A. No, I didn't . . .

"Q. And then I think you said, Mike, you don't know how long it was before you went back to him the second time, is that right?

"A. No, I don't remember. The girl told me to get in again, so I went in . . .

"Q. Well, you mean some little girl about your age, or do you remember who the girl was?

"A. No, I never saw her before, but she told me to go in. So I went in again and went along the edge of the pool, and he didn't even try to get me that time . . .

"Q. And Mike, going back to the first time when you thought Joe was playing with you there in the water and you didn't think there was anything wrong, you didn't yell out or anything like that, did you?

"A. No, I just went in the water and struggled to get free and then swam to the shore . . .

"Q. Just a question, Mike. Can you describe how he— how he looked at the time the girl told you to go there?

"A. Well, he was just like if you could stand up in water, he was standing up, and his hair was just floating around, and I didn't see his face or anything.

"Q. And that is why you went, is because the girl told you to go?

"A. The girl told me to go, so I went in after him.

"Q. And the second time, I believe, you told Mr. Conley here that you held to the rim, and tried to reach him that way? A. Yes."

Margaret Smittcamp, a student at Fresno State College, testified:

"Q. Now, just tell us about how—when you first saw him.

"A. Well, Bill Mitchell and I were just going to dive in and swim across, and I saw that—this boy on the bottom of the pool, so I told Bill about it. And we thought at first the boy was just swimming real deep. And finally the boy didn't move, so we looked around and couldn't find a life guard so Bill dove in and brought the boy out.

"Q. And did you help pull the boy out?

"A. I did, yes.

"Q. And what end of the pool was that?

"A. On the east end.

"Q. That is, down where the diving boards are? A. Yes.

"Q. And what—did a life guard come later?

"A. Yes he did.

"Q. How long was it before he came, do you know?

"A. Oh, it was about three or four minutes later . . .

"Q. In the meantime did you and Bill try to resuscitate him? A. Bill did, but I did not. . . .

"Q. After the life guard came did he also work to try to resuscitate the boy? A. Yes, he did."

William D. Mitchell, a college student, testified:

"Q. What first called your attention to the presence of the boy in the pool?

"A. Margaret did.

"Q. And where was the boy when you first saw him?

"A. He was right in between the two diving boards at the deep end of the pool.

"Q. That is, at the east end of the pool? A. Yes.

"Q. And in what position was he at that time?

"A. As Margaret said, his hands were outspread. He looked like he was swimming.

"Q. And did you look for a life guard at that time?

"A. Yes, I did, after we thought something was the matter.

"Q. Yes. And did you see one? A. No, I did not . . .

"Q. But when you did think there was something wrong, then you dived in?

"A. No. First I went to look for the life guard.

"Q. And after you got him on the surface what did you do?

"A. Well, I laid him on his face and stretched his arms out and then gave him artificial respiration as best I could . . .

"Q. And then when the life guard came did he help try to resuscitate him? A. Yes. I was through. I got up from the boy, and just as I got up why the life guard came."

Oren Seaman, also a college student, a witness called by defendants, testified:

"Q. Did you see Bill Mitchell dive in for the boy?

"A. No. I saw him first when he was trying to push him up on the bank.

"Q. I see. And what did you then see? What happened then?

"A. Well, I know Margaret and Bill, both, and Margaret was helping Bill get the boy out of the pool. And I let out a holler, then, for Bill, and I don't know whether Bill heard it or not. And then I ran down to Mr. De Vaux and told him there was a boy being pulled out of the pool, and better call the fire department. . . .

"Q. Now, you say you called for Bill Young. Did you call for him by name, or for the life guard?

"A. I called, 'Bill.'

"Q. You called Bill. Now, did you see him when you called for him?

"A. No, I did not. I didn't even wait to look. I ran down to get Mr. De Vaux.

"Q. And which side of the pool did you run on, the north side or the south side?

"A. The north side. . . .

"Q. Then you went over to Mr. De Vaux and came back, did you? A. Yes, I did.

"Q. And when you came back he was there?

"A. Yes, that is right. I wasn't gone more than two minutes."

Bill Young, the life guard, testified:

"Q. And how was your attention called to that situation up at the other end?

"A. Somebody shouted, and I——as I looked up I could see them down at the other end, just as they were pulling the boy out, or just afterwards.

"Q. And what did you do then? A. I ran down there.

"Q. Down there where the boy was? A. Where the boy was, yes. . . .

"Q. Was Bill Mitchell there, the young man who testified?

"A. I didn't recognize him.

"Q. I see. What did you do when you got down there?

"A. Well, I started giving him artificial respiration. . . .

"Q. Mr. Young, when you got down to where the boy was, and began to work with artificial respiration, did you notice as to the apparent temperature of his body, as to whether it was warm or cold?

"A. It just felt like anybody's, who had been in swimming, cool from the water, but the flesh was warm.

"Q. Was there anybody doing resuscitation work when you came down there?

"A. Not to my knowledge. I didn't see anybody."

The record shows that after Bill Young, the life guard, attempted vainly to resuscitate the boy the pulmotor squad of the fire department arrived and also tried, without effect, and there is no dispute as to the fact that the boy died from drowning.

We have quoted portions of the record most favorable to respondent. There is, of course, other testimony contradicting much of the testimony quoted but, as hereinbefore stated, we are not here concerned with the matter of weighing conflicts in testimony. The question we have to decide is whether, taking all of the evidence into consideration, together with every inference and presumption favorable to respondent which may be deduced therefrom, and disregarding all evidence in conflict therewith, we must conclude that the evidence is insufficient to sustain the verdict of the jury.

We have studied the record carefully. While it must be stated that the evidence on the part of plaintiff is not overwhelming, yet we do not believe it may fairly be said that

it is lacking in sufficient probative force to support the verdict. We believe this is one of that class of cases where a trial court would not be justified in granting a motion for a directed verdict, but in which he might have been justified in granting a motion for a new trial. In this case, no motion for a new trial was made, and, unfortunately for appellants, we do not have the same power to weigh the evidence as the trial judge, who is virtually a thirteenth juror, would have upon a motion for a new trial.

The law requires that one or more *qualified* life guards, having no other duty to perform at the time, shall be on *life guard duty* at each pool where admission is charged. It must be assumed that this requirement means what it says and that the State Board of Health used the word "qualified" advisedly. While no exact standard has been specified it may reasonably be assumed that a qualified life guard is one who has at least ordinary powers of observation, who is vigilant and attentive to duty, and who realizes that, particularly in a swimming pool in which young children are charged admission to swim, he should be watchful for any sign of distress or danger and quick to render assistance. Parents sending children to a public swimming pool to swim have a right to assume that there will be a *qualified* life guard on *life guard duty* at the pool.

In California, inferences in themselves constitute a recognized class of indirect evidence which a court or jury may not disregard. (Sections 1957, 1958, Code Civ. Proc.) Furthermore, "Upon the trial of a case, the jury is to find not only the facts but also the inferences from them, if any may properly be drawn. . . . When an inference is supported by the evidence, and is not opposed to human experience and reason, it cannot be disturbed by an appellate court." (10 Cal. Jur. 738.)

We believe that the jury in the instant case had a right to infer from the evidence that a life guard 16 years of age who did not observe what two 11-year-old girls and 11-year-old Mike Mitchell observed, namely, that little 11-year-old Joe Lindsey was "floating in the water with his head up toward the water and his feet pointing toward the bottom," and, "that he was standing up and his hair was just floating around"; who did not observe the struggle of Joe Lindsey with Mike Mitchell the first time Mike swam to him; who did not observe Mike go in the second time to go after him; who,

although the entire pool was 100 feet long, did not appear at the place where Joe Lindsey was lying until four minutes after he had been pulled out of the water by Bill Mitchell; was not a qualified life guard, was not present at the pool when Joe Lindsey was struggling and in distress, and was not on life guard duty at the pool when Joe Lindsey was drowned. We believe, further, that the jury had a right to infer that a life guard on life guard duty at the pool, being, as he should be, in a position where he could observe to a reasonable extent, swimmers, and particularly children, within the pool, would have observed the unusual position of little Joe Lindsey, which should have been indicated to a qualified life guard, if not to 11-year-old Mike Mitchell, that Joe Lindsey was not in any normal swimming position but was in distress and difficulty. The jury further had a right to infer from the evidence that Bill Young was not present, or on life guard duty or he would have observed these things, and that if he had been present and had observed them, he would have rescued the boy and the drowning would not have occurred. The pool was 100 feet long and 35 feet wide. There is evidence that there were other bathers but there is no evidence to show that the pool itself was crowded with swimmers; in fact, the inference would be to the contrary as all of these young children were up toward the diving board and if there were many adults swimming it is hardly likely that the young children would be at that end of the pool; and there is nothing in the record to prevent the jury from properly inferring that a life guard, being present on life guard duty, could have observed Joe Lindsey's unusual position in the water indicating his danger and distress.

Appellants assert that even assuming that the life guard was not on duty when Joe Lindsey was drowned, respondent has failed to show any causal connection between this alleged negligence and the accident complained of. In our opinion, this contention is fully answered by the following language in the case of *Rovegno* v. *San Jose K. of C. Hall Association*, 108 Cal. App. 591 [291 Pac. 848], at page 595, in which case a hearing was denied by the Supreme Court:

"The most serious question for determination is the question of proximate cause—does the record disclose any evidence of negligence on the part of respondents proximately causing the death of appellant's son? As above stated, the only negligence alleged is the failure of respondents to provide a life-

guard or other person or persons skilled in life-saving. Even had such a guard been present, respondents urge, there is no showing that the boy's life would have been saved. Just what would have happened had a life-guard been present is, of course, not capable of direct proof. It is largely a matter of speculation or of inference. Even so, it has been held that the question is one for the jury and not for the court.''

■ We conclude, therefore, that the evidence is sufficient to sustain the judgment, and that the trial court properly denied appellants' motions for a directed verdict and for judgment notwithstanding the verdict.

■ Appellants contend that ''the uncontradicted testimony shows that while Mr. and Mrs. De Vaux owned the land on which this pool was situated, Mr. De Vaux alone maintained and conducted the pool'' and that, therefore, the judgment against Mrs. De Vaux is not justified.

Appellant De Vaux, called by respondent under section 2055 of the Code of Civil Procedure, testified: ''Q. That property is owned by you and your wife? A. That is it.

Q. You, of course, operate a swimming pool upon the property there? A. Oh, yes.''

On redirect examination De Vaux testified: ''I operate the pool.'' On re-cross examination he testified: ''Q. You do as head of the family, is that it? A. I am the daddy of the family, yes. Q. But it is operated on property owned by you and Mrs. De Vaux? A. That is right. Q. And standing in your respective names? A. That is right.'' The evidence showed that appellants both resided upon the premises and were both active in the operation of the pool.

This evidence was ample to justify the jury in inferring that Mrs. De Vaux was jointly interested and participated in the operation of the pool.

■ Appellants sought to introduce in evidence a notice posted at the pool in compliance with the requirement of the State Board of Health and also sought to introduce in evidence certain signs posted at the pool which were to the effect that anyone using the diving apparatus or pool did so at his own risk. The trial court sustained respondent's objections to the introduction of this evidence.

Assuming, without deciding, that such offered evidence should have been admitted, we are unable to see how its exclusion could have been prejudicial to appellants. There was no evidence that decedent had violated any rule, and

the mere presence of signs stating that the bather used the pool at his own risk would not affect the duty of appellants to have a qualified life guard on life-guard duty at the pool.

Appellants' final contention is that the trial court erred in giving the following instruction:

"You are instructed that it is the duty of a life guard to use reasonable care and diligence in watching a public swimming pool and the persons using the same, so that he may, in case of an emergency, render reasonable assistance to one likely to drown."

We have already referred to the requirement of the State Department of Health that one or more qualified life guards should be on life-guard duty at each pool. We do not believe that said instruction goes beyond a fair interpretation of the meaning of said rule of the State Department of Health, or that it does more than to state what is meant by the requirement that a qualified life guard shall be on life-guard duty. If a life guard is not required to do what is set forth in the instruction objected to, it may well be asked why a life guard should be required. We see no error in this instruction. Furthermore, the trial court gave numerous instructions offered by appellants upon the issues of negligence and contributory negligence, and instructed the jury at appellants' request that "if you shall find from the evidence that at the time Joe Lindsey was drowned there was a life guard, having no other duty to perform, on life guard duty at said pool, it is your duty to bring in a verdict in favor of defendants." So, even if it were held that said instruction now objected to were erroneous, it could not be considered a sufficient error to require a reversal of the judgment.

For the reasons hereinbefore set forth, the judgment is affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing was denied April 9, 1942, and appellants' petition for a hearing by the Supreme Court was denied May 8, 1942.