[Civ. No. 13978.   Second Dist., Div. One.   Sept. 13, 1943.]

GRACE SOEST, Respondent, v. DR. W. E. BALSINGER, Appellant.

A. Brigham Rose for Appellant.

Boyd Barrington, George N. Foster and Chas. L. Nichols for Respondent.

YORK, P. J.—Respondent Soest brought the instant action in malpractice to recover damages from appellant, a physician and surgeon, for alleged disfigurement and permanent deformity resulting from operations performed by him on respondent's nose.

This appeal is prosecuted from the judgment for $5,000 which was entered pursuant to the verdict of the jury, as well as from an order denying appellant's motion for a new trial.

The record herein discloses that respondent had for some time suffered from severe headaches and had difficulty in breathing, and that two doctors had advised her that she needed a submucous resection of the nose in order to relieve such trouble. On May 28, 1940, she consulted appellant regarding her condition and after examining her nose by pinching it on the bridge, probing it with a letter opener and looking into it, appellant told her that her "septum was as crooked as a letter S''; whereupon plans were made for an operation to be performed by appellant on May 30, 1940, in his office. At this time appellant urged respondent to permit

him to remove a scar on her forehead and also to reshape her nose by removing the hump, but respondent expressed her disapproval and declined to have such work done.

Without making any further examination, appellant operated on respondent's nose on May 30, 1940, first applying a local anesthetic through needles introduced into the nose, and in addition to the so-called submucous resection, he removed the hump on respondent's nose and the scar on her forehead. The nose was securely packed with gauze to prevent bleeding and to ward off any infection from the outside, and respondent returned to appellant's office daily for a check-up. After about a week had elapsed, the packing was removed and it was found that the nose had become infected. During this time respondent suffered from sore-throat, swollen lymph glands and severe throbbing pains; her nose was swollen and tightly closed, and her eyes were swollen shut. To relieve this condition, appellant incised both nostrils which resulted in a discharge of pus from the nose.

From the day of the operation on May 30 until the middle of August, 1940, respondent followed appellant's instructions in the care of her nose and reported to him frequently for check-ups. On August 19th, appellant performed a second operation on respondent's nose, which was then completely closed. This second operation involved the taking of sixteen stitches in the nose and thereafter it was necessary for respondent to insert a rubber tubing in order to keep the nose open. Within a few days after this second operation, respondent was cleaning her nose at home, as instructed by appellant, and discovered a hole in the septum. Three such holes developed, over which incrustations formed, making it impossible for respondent to keep her nose either open or clean. Shortly after the second operation, appellant left for Chicago, and upon his return to Los Angeles on October 6, 1940, respondent complained to him of the holes in the septum, the misshaped rims of the nostrils and other ill-effects of the operations. Appellant then for the first time admitted the infected condition of the nose, and told respondent another operation would be necessary. Again in November of 1940, appellant urged respondent to submit to a further operation, but she refused owing to her lack of confidence in him.

The complaint herein alleged, among other things, that appellant "carelessly and negligently removed too much of the septum of the nose, leaving therein a hole too large to heal; that he cut and removed from the nose a large portion

of the hump on top of plaintiff's nose which he was specifically instructed not to do, and which plaintiff avers was not necessary to be done in order to correct plaintiff's breathing; that (defendant) herein removed a great deal of the flesh around the bridge and on the septum and cut away too much of the membrane from other parts of the nose of said plaintiff; that in doing so he did not use proper care; the defendant did not, in furtherance of said operations take any blood test of said plaintiff, he did not take plaintiff's blood pressure; he made no urine test; he took no X-rays nor did he make any test of any kind to determine whether or not said plaintiff was a bleeder and in fit condition to undergo said operation. Plaintiff avers that it was defendant's duty to do these acts and things as enumerated in accord with proper and skillful practice. . . .

"That through lack of . . . and cleanliness of said defendant who did not use protective rubber gloves in performing said operations, through lack of ordinary proper medical skill, and through lack of proper precaution, cleanliness and carelessness on the part of said defendant while performing said operations, the nose of said plaintiff became inflamed, swollen, festered and infected; that by reason of said negligence and carelessness of said defendant, as aforesaid, and as the direct result thereof, and as the sole and only cause of said carelessness and negligence said plaintiff suffered and still suffers intense pain and great mental distress and anxiety and the nose of said plaintiff has become sore, wholly disfigured and is permanently deformed."

In his answer appellant denied generally and specifically the allegations of the complaint, alleged that he was a physician and surgeon restricting his practice to that branch of medicine known as plastic surgery; and as a defense alleged that if respondent "sustained any results not anticipated, or any infection, or otherwise, as represented or described in her complaint, such condition resulted from Plaintiff's acts, carelessness and improper exposure, which was not under the control or care of this answering defendant, and for which this defendant is in nowise responsible."

Appellant doctor testified in his own behalf to the effect that he examined respondent's nose and "found that in the right nostril the septum extended down here aways and occupied about one-third of the right nostril, and on the left, about three-quarters of an inch to one inch above the nostril margin I found a recessed mucous membrane with the septum

curved to the left almost touching the lateral wall on the left side. . . . I got the history that she had had these headaches and a good bit of secretion from the nose and difficulty in breathing.'' In answer to the question: ''Did you make inquiry about her health in general. . . . Will you tell us what inquiry was made and your observations at that time?,'' the witness answered: ''Well, as to her general condition, if she had ever been subject to bleeding, if there was any condition of the heart or lungs that she had been affected with, or any condition other than this complaint of lack of breathing, and I made this examination, as I say, of the nose, and the interior of the nose, and that practically covers it.'' Appellant then described in minute detail how he performed the first operation, and was then asked if, in performing this operation, he had followed the same procedure he had in several thousands of operations previously performed by him. To this he replied: ''I did the surgical preparation. Now, as far as the technique of the operation, I mean, certain things may have been done in this like correcting a deviated type of septum, but our surgical techinque is a routine procedure, like a hospital. We have established what has been good technique and we follow it out and did follow it out in this operation.''

Appellant using a diagram also testified regarding what he observed from an examination in court of the perforations then present in respondent's nose:

''This morning, on examination in this region . . . it looked like as though there might be a little opening of a sebaceous gland, or cyst, or something of that sort, but on bending this over, evidently in the line of incision there, there had been a small opening that either did not heal from the infection that you might put the point of a toothpick into. As I indicated here, this was my line of incision for the straightening out of this curved septum. . . . The first opening is about in this position two-thirds up from the palate and just in the line of incision back of the columella. . . . If I did not bend that over that wouldn't show. There was a hole there, but doing that you could detect—you could stick a small toothpick through that point, probably at the point of incision. . . . Now, this is a minute opening. I was led to believe the other day that you could stick your finger through it. Here is your palate in here. Right on the floor where I made this incision, there is a little area, I judge almost an inch up from the entrance of the nostril and that opening is about this shape, but not so big. It isn't round at all. It would indicate

probably that the mucous membrane here had not quite healed together but it is something that could be readily brought down. It is just a tiny opening. It isn't a quarter of an inch. It is between one-eighth and a quarter of an inch and about 1/32 of an inch wide. When I put an applicator in one nostril and look at the other, I could just see my white cotton shining through that. The third opening is yet to be discovered. Q. In respect to . . . the second opening, as you have illustrated it here, it is sort of lipshaped, is that right? . . . A. Yes. It should go just where this incision came down right there and here is the other pin point.''

Regarding the second operation performed on August 19, 1940, appellant testified: ''It was done as a temporary procedure because both the patient and I had in view the doing of a corrective operation resulting from the infection, so this was merely done as a minor thing until some future date when the complete job could be done.''

Appellant was asked: ''Is there anything you could have done from your experience as a physician and surgeon that would have prevented—that you could have done that would have prevented the infection that this lady contracted?'' His reply follows: ''A. No, I believe not. Q. Is there anything from your experience as a physician and surgeon that you did not do, or that you did do, that you can attribute the little scars and dimples to that have been described on a number of occasions? A. There was no avoiding it. Of course, the scars are the result of my opening it, but I had to open it for the infection, if that is the answer.''

The nurse who assisted appellant at the first operation testified that when the packing was removed from respondent's nose about a week after the operation, a purulent discharge followed the removal of such packing; that when appellant removed the packing he wore neither a smock nor a cap and was smoking cigarettes; that respondent asked appellant what was wrong, and he replied that everything was all right, that there was nothing wrong. This witness also testified that she had a conversation a day or two after the packing was removed from respondent's nose at which time appellant blamed said witness for a slip-up in technique. ''He rather blamed me for not sterilizing the instruments properly—not carrying out the technique.''

Appellant contends that respondent failed to offer in support of her charge of malpractice any expert opinion that he failed to disport himself in his treatment and operative

technique along the pattern recognized by legal authorities. In support of this contention, appellant cites the cases of *Ross* v. *Hieronymus,* 2 Cal.App.2d 258 [37 P.2d 837]; *Mc-Namara* v. *Emmons,* 36 Cal.App.2d 199 [97 P.2d 503], and *Engelking* v. *Carlson,* 13 Cal.2d 216 [88 P.2d 695], the latter of which holds that ''negligence on the part of a physician or surgeon will not be presumed; it must be affirmatively proved. On the contrary, in the absence of expert evidence, it will be presumed that a physician or surgeon exercised the ordinary skill and care required of him in treating his patient.''

Respondent produced three physicians and surgeons, who gave their expert opinions, to the following effect:

Dr. Ginsberg was asked: ''Doctor, what is the usual procedure in an operation of this kind, in this vicinity, in the vicinity of Los Angeles, with reference to examinations, or examination of the patient prior to an operation of this kind? A. There is an external and internal examination of the nose to examine, to see the quality of his skin. We diagnose the deformity of the nose. We see that there are no lesions, or infections on or around the inside of the nose and it is wise to examine the urine for sugar. Some surgeons do make blood examinations, others don't. . . . Q. And you state that you check the matter of any lesions in the nose as well as the deformity. Now explain to the Court and jury what you mean by that. A. There might be ulcers inside the nose that would complicate surgery and these might be syphilitic, which might complicate the surgery. The nose might have a very bad perforation which would make a plastic procedure more or less unadvisable. . . . Q. Now, in a case where an operation upon the nose was performed on May 30, 1940, and subsequently on, let us say, August 13th, or 19th . . . another operation was performed while there was still an infection, would that be proper procedure? . . . A. . . . . If there is an infection present no surgery should be performed.''

Dr. Kiskadden, a physician and surgeon specializing in plastic and reconstructive surgery, who examined respondent subsequent to the operations on her nose, testified that he found three holes in the septum of respondent's nose; that ''two of them are rather low down and can be plainly visible by just looking through her nostrils. The third one is further back and one has to look deeply into her nostrils to see it. . . . The small hole is probably $\frac{1}{8}$ of an inch across and the next one is probably $\frac{3}{8}$ and the larger one is probably $\frac{1}{2}$

inch across, in the back. . . . Q. Where there is an infection in the nose, let us say at the bridge, and a drainage has been established to assist in that infection, what can you say as to a doctor or surgeon squeezing these places where the drainage has been established, with his finger nails? A. Well, that is not the ordinary way of evacuating infection. . . . Q. What is the ordinary way, Doctor? . . . A. Given an infection in the nose, if there is an opening and there is serum, or pus, or infection present, usually a sterile instrument is introduced into the area and the sterile gauze is placed about the wound to collect any discharge. The wound itself is swabbed with an antiseptic usually before and always afterwards. . . . Q. From your examination of the septum prior to this operation of May 30th, which I believe was back in 1938, and your examination afterward, would you say that there had been an attempt,—would you say or would you not say that there had been an attempt on Mrs. Soest's nose to perform a submucous resection to remove a portion of the septum? A. Yes, I think an attempt has been made. Q. And what can you say as to that attempt from your observation as an expert? A. Well, I believe at the present time her septum is fairly straight. She has these holes. Q. Will or will not these holes affect this plaintiff's health? . . . A. Well, that is a very difficult question to answer yes or no. The holes are there, and they may or may not accumulate crusts, and they may or may not collect infection. If they do collect crusts and infection, perhaps underneath, it may have something to do with her health, on the contrary, if they don't collect crusts and remain perfectly clean as small holes, I don't believe her general health will be particularly affected. . . . Q. If you found that this same patient, Mrs. Soest, did accumulate scabs in her nose and crusted mucous at these holes in the septum and was required to have a doctor to clean out her nose at approximately two week intervals, or at about that time, what would you say as to whether or not that condition would affect her health? A. Yes, I think it would affect her health . . . holes in the nose may cause a whistling noise and odd sensations.'' Dr. Kiskadden was then requested to examine the bridge of respondent's nose and to state what he found, whereupon he stated: ''On the right lateral aspect there appears to be a small scar and then over the bridge there is a round pit and just below that pit there is a second rather trap-door shaped scar. The scar at the present time seems a little red. Q. Can you give a cause for that, Doctor? . . . A. I would say that

is probably because the scar on the bridge seems to be attached to the bone underneath and there does not seem to be a free return of the circulation in and to it because of that attachment. It causes congestion of blood there. Q. And what can you say as to the destruction of any of the blood vessels there, or enlargement, or whatever it may be? A. In these operations there is a destruction of the blood vessels, but Nature restores them. The redness here is due to the fact that there is an adhesion between this skin, or between this scar and the underlying tissue. Q. You mean it is attached to the bone? A. Yes.'' The witness' attention was called to certain depressions on respondent's nostrils and was asked what was the cause thereof, to which he answered: ''The indentation could be caused first, either taking away too much tissue so that there is no underlying tissue separating the lining of the nose and the outside of the nose. This underlying tissue could likewise be lost through infection. It could be pushed away, the position of the tissues there, due to operative interference, or swelling, and swelling immediately post-operative. It could be due to the placing of a stitch in the nostril through and through the scab. . . . Q. As a plastic surgeon could you or could you not make a recommendation at this time to the jury as to any correction of Mrs. Soest's nose so far as the outward appearance is concerned? A. The correction of her nose is an extremely difficult thing and I would say, under the circumstances, she would face at least two operations and possibly more, and I personally would not promise her that I would be able to restore her nose to what it was before or to what would pass as a normal appearing nose. . . . Q. From the history of the case and your various examinations of Mrs. Soest, have you come to any opinion or have you reached any opinion as to the cause of the holes in the septum? A. Yes, I think I have. . . . Q. What is your conclusion, or opinion as to the cause? A. I believe that the holes probably occurred from the work done at a time a probable submucous resection was performed. *Mr. Rose:* I move that be stricken on the ground the answer is based on probabilities. There is nothing to show a submucous resection was ever performed. *The Court:* The motion is denied. Of course, we are getting his own opinion from this witness.''

The third physician and surgeon to testify for respondent was Dr. Rambo, specializing in eye, ear, nose and throat and rhino-plastics. He was asked: ''Q. Are you acquainted with

the ordinary surgery in this line, in this community, of surgeons with reference to the removal of what you have referred to as the perpendicular strut at the very front of the nose? A. Yes. Q. What is the practice as to that? A. There are times when it should be removed, or may be removed, and there are times when it should not be removed.'' With respect to what might have caused the perforations in respondent's nose, this witness stated: ''Perforations in the septum following a submucous resection, if a submucous has been done here, may be caused either from perforation of both layers through and through, perforations at the time of surgery which broke down the circulation and caused the perforation. They may be due to infection either before or after surgery which remains after surgery.''

An examination of the record, including the reporter's transcript from which the above excerpts are quoted, reveals ample evidence of medical experts from which the jury could have inferred that appellant did not use that degree of care and skill exercised by doctors in the same locality.

Moreover, as heretofore pointed out, the nurse assisting at the first operation testified that appellant charged her with failure to properly sterilize the instruments he used on respondent's nose in performing that operation; and the record clearly shows that appellant performed the second operation at a time when respondent's nose presented a dirty field of infection.

''Where the results of negligence on the part of a physician or dentist are peculiarly within the knowledge of experts, the testimony of those experts is a necessary element of a plaintiff's case. The danger of infection from an unsterile instrument, or a dirty field of operation, is a matter of such common knowledge that a jury is authorized to draw the reasonable inference that an infection was caused by negligence where an unsterile instrument is used, or the operative field is not properly sterilized. [Citing authorities.]'' *Mastro* v. *Kennedy*, 57 Cal.App.2d 499, 504 [134 P.2d 865].

While there is much conflicting testimony in the record, there is also substantial evidence, which, coupled with the reasonable inferences to be drawn therefrom, points to a lack of due care on the part of appellant as the proximate cause of the infection suffered by respondent and the resulting perforations in the septum of her nose. Since the evidence produced presented questions of fact for the determination of the jury, appellant's motion for a nonsuit was properly denied.

█ As was so aptly stated by this court in the case of *Mirich* v. *Balsinger*, 53 Cal.App.2d 103, 114 [127 P.2d 639] : "It must also be remembered that in malpractice cases it is not necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence of the physician resulted in the injury to the patient. Were such the rule, it would rarely be possible to recover in a case of negligence in the practice of a profession which admittedly is not an exact science. It is therefore not required in the trial of such cases that the negligence of the defendant as the proximate cause of the injury be established with such absolute certainty that any other conclusion is excluded. Substantial evidence which reasonably supports the judgment is sufficient. (*Dimock* v. *Miller*, 202 Cal. 668, 671 [262 P. 311].)"

In view of the conclusion reached by this court, it is not deemed necessary to discuss the other two points raised by appellant.

The attempted appeal from the order denying motion for a new trial is dismissed.

For the reasons stated, the judgment appealed from is affirmed.

Doran, J., and White, J., concurred.

A petition for a rehearing was denied October 4, 1943, and appellant's petition for a hearing by the Supreme Court was denied November 8, 1943.