[Civ. No. 26949. Second Dist., Div. One. Sept. 16, 1963.]

GILBERT PAUL CARRASCO, a Minor, etc., et al., Plaintiffs and Respondents, v. GEORGE BANKOFF et al., Defendants and Appellants.

Kirtland & Packard, Judith O. Hollinger and Robert C. Packard for Defendants and Appellants.

Harney, Drummond & Fitzwater, David M. Harney and Robert E. Ford, for Plaintiffs and Respondents.

LILLIE, J.—Plaintiffs sued Carobil Hospital, Dr. Novick, administrator, and Dr. Bankoff, chief surgeon, for negligence in the care and treatment of a minor for third-degree burns. Judgment for $35,000 in favor of Gilbert and $6,500 in favor of his father was entered on a jury verdict.

Indulging in an extensive factual argument which has no place in a reviewing court (*Overton* v. *Vita-Food Corp.,* 94 Cal.App.2d 367 [210 P.2d 757]; *Crawford* v. *Southern Pac. Co.,* 3 Cal.2d 427 [45 P.2d 183]; *Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689]) and devoting their briefs exclusively to those portions of the testimony favorable to them (*Estate of Palmer,* 145 Cal.App.2d 428 [302 P.2d 629]; *Goldring* v. *Goldring,* 94 Cal.App.2d 643 [211 P.2d 342]; *Estate of Good,* 146 Cal.App.2d 704 [304 P.2d 190]), completely ignoring their burden to demonstrate that there is no evidence to support the judgment (*Bradford* v. *Winter,* 215 Cal.App. 2d 448 [30 Cal.Rptr. 243]; *Nichols* v. *Mitchell,* 32 Cal.2d 598 [197 P.2d 550]; *New* v. *New,* 148 Cal.App.2d 372 [306 P.2d 987]), appellants contend "... there is insufficient evidence that Dr. Bankoff failed to exercise that degree of care which the average reasonable physician would have exercised under

similar circumstances'' (A.O.B., p. 10), and, assuming his negligence, there is ''no evidence'' that ''his negligent act, actually and proximately caused the damage.'' (P. 23.) However, notwithstanding appellants' flagrant violation of settled practice in the reviewing courts, we have carefully examined the lengthy record before us keeping in mind the fundamental rule that the power of this court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support the judgment, and when two or more inferences can reasonably be deduced from the facts, it is without power to substitute its deductions for those of the trial court (*Wooten* v. *Coerber,* 213 Cal.App.2d 142 [28 Cal.Rptr. 635]; *Brewer* v. *Simpson,* 53 Cal.2d 567 [2 Cal.Rptr. 609, 349 P.2d 289]; *Gruner* v. *Barber,* 207 Cal.App.2d 54 [24 Cal.Rptr. 292]), and deem their contentions to be without substance.

The following is a résumé of the evidence viewed in the light most favorable to respondents. (*Crawford* v. *Southern Pac. Co.,* 3 Cal.2d 427 [45 P.2d 183]; *Estate of Arstein,* 56 Cal.2d 239 [14 Cal.Rptr. 809, 364 P.2d 33].) On July 8, 1959, Gilbert, then 6 years old, suffered extensive burns while playing Superman; 15 minutes later his mother delivered him to the emergency entrance of defendant hospital where Dr. Levonian, then in charge of the emergency room, administered to him. He was in serious condition; he had burns about the right side of the face, right arm, shoulder, ear and neck, and left arm, forearm, and wrist, and third-degree burns on the whole of his right arm and more than half of his chest and back; and, according to Dr. Levonian, 18 per cent of his body was covered with third-degree burns. (Defendant Bankoff testified to 30 per cent; however, his testimony appears to be influenced by the undisputed fact that after 53 days under his care the third-degree area had increased to 25 per cent.) Dr. Levonian admitted Gilbert on an emergency basis to spend only the first few days in defendant hospital, but without previous arrangement with, or knowledge of, his parents, Gilbert, though severely burned and subject to infection, was transferred to a 10 or 12-bed ward in defendant hospital where he remained under defendant Bankoff's care for 53 days. The parents were told they would be liable for full hospital rates in addition to Dr. Bankoff's fee of $750; Dr. Levonian was under defendants' orders to refer the case to Dr. Bankoff, an employee of defendant hospital.

The ward was occupied by other children whose parents

regularly visited them; defendants kept the back door and windows open; and one child suffered for three days with measles. Defendant hospital, a small community hospital, had not, in the memory of the witnesses, before treated a major burn case; it was not equipped to treat serious third-degree burns; its facilities included no isolation room for isolation and sterile technique and no recognized recovery room; and its lack of facilities prevented Gilbert from being placed in isolation and cared for with sterile technique and the ''open-method'' treatment.

On the first day Gilbert slept and rested quietly; three days after admission he passed the critical stage, began ''to liven up a little bit and he looked a lot better,'' and on the third day started watching television and played with his parents. According to Dr. Levonian, Gilbert developed no problems other than the burns themselves, never went into shock and had only minimal pain; he also testified that Gilbert's general condition did not prevent early grafting.

At no time during the 53 days under defendants' care were Gilbert's blood pressure, pulse or respiration taken or recorded or his weight ascertained or noted; defendant Bankoff made no record of the description of his burns or the depth of any particular burn; according to defendant Bankoff's letter of August 28, 1959, dressings were changed only every 12 days, then, under general anesthesia not administered by a doctor; no progress notes were made for the first 16 days and what records and notations were thereafter made were inaccurate, inadequate and incomplete (no mention was made of the surgery on August 6); Gilbert was given no particular formula or diet and no potassium tests; he was never fed by tube; no sodium, $CO_2$, or electrolyte balance studies were done; no examination was ever made of Gilbert's heart, lungs, kidneys or vital organs; and he was never catheterized. Defendant Bankoff, who claims to be a specialist in the treatment of burns but who has never been certified by the American Board of Plastic Surgeons and has never treated a third-degree burn case in this state, saw Gilbert on July 11, the fourth day; he told Gilbert's mother that he would graft skin in small pieces which would eventually grow together in ''dichondra fashion.'' However, no grafting was done until August 6, over four weeks after the burn; it was done by defendant Bankoff and was the one and only graft done during the 53 days Gilbert was under defendants' care. By that time contracture was already

setting in; scar tissue formation had started as of July 24; and the graft was small, covering only 1 per cent of Gilbert's third-degree area. With ''full-thickness'' skin he took from Gilbert's uninjured right thigh he placed small pieces on the wrist of the right hand, three fingers of the left hand and the inner surface of the right elbow. The graft consisted of ''very small, postage stamp affairs'' and ''not large enough ... (and) not the right shape to prevent contractions,'' and resulted in ''incomplete takes.'' The graft at the elbow area was ''quite inadequate.'' Defendant Bankoff did no more grafting; he did nothing on the major burn area. Moreover, in removing skin from Gilbert's thigh, defendant Bankoff took ''full-thickness'' skin using the ''free-knife'' method, which ''is passé and unacceptable in any Los Angeles hospital,'' inflicting on the thigh another third-degree defect which later had to be covered by graft at Childrens' Hospital. While he denied using the ''free-knife'' method (which depends entirely upon the skill of the knife wielder), insisted he used the electric dermatome method and denied he took ''full-thickness'' skin (he admitted the graft ''was deeper than usual''), all experts agreed the skin was ''full-thickness,'' taken by the ''free-knife'' method, which created a third-degree defect on Gilbert's thigh; further, defendant Novick testified that defendant hospital had no electric dermatome in its inventory when it was sold.

After the graft there was considerable bleeding of the thigh and a week later Gilbert began ''to go downhill''; he became very tired and thin, lost his appetite and began to lose a lot of weight, and his legs became very thin. Thereafter, he was several times prepared for further grafting but none was ever done. On the 52d day Gilbert's father examined him; he ''couldn't see any graftings of any kind other than these little patches ... couldn't see anything. The boy was still—there was no skin on him, you know.'' Defendant Bankoff then told him Gilbert was being transferred to Children's Hospital because ''he didn't have enough facilities to do the grafting,'' and didn't have all the equipment he needed; he also suggested to Gilbert's mother that he was transferring him to Children's Hospital ''because they had better facilities to take care of serious burns''; and on the 53d day (August 30) he transferred Gilbert to Children's Hospital. Two days before, on August 28, defendant Bankoff wrote he was transferring him ''because of lack of facilities in this [defendant] hospital for treatment of such extensive burns''; and he admitted in his

testimony that from the beginning of Gilbert's stay he felt that the facilities were inferior. During the 53 days in defendants' care Gilbert's third-degree area had increased from 18 per cent to 25 per cent, and defendant Bankoff had grafted but 1 per cent of the burn area leaving 99 per cent of it ungrafted and uncovered. Defendant Bankoff admitted that on July 24 Gilbert was ready for grafting, also on August 1, but none was done until August 6; he also testified that all third-degree burn areas should have been grafted on August 28.

Immediately upon his transfer to Children's Hospital Gilbert was examined and placed in isolation (single-bed room) where he remained until October 30, 1959. After his release he returned for six separate additional surgical procedures, spending another 30 days in Children's Hospital. The record of examination of Children's Hospital discloses that when Gilbert left defendants' care he had 8-week-old 25 per cent third-degree burns involving the right ear, right jaw, right arm, left hand, back and chest regions, skin graft of three fingers of the left hand with beginning contracture of these fingers, and several small "full-thickness" donor site defects on the right thigh; and that he suffered from malnutrition. Exhibits 3, and 5 through 11 (color photos) portray Gilbert's condition at the time — granulation tissue consisted mostly of blood-raw areas.

R. C. Hadley, M.D. (specialist in plastic surgery, who thereafter treated Gilbert in Children's Hospital) examined him on August 31. Gilbert had an all-over appearance of mild toxicity, a ducubitus ulcer on his head, hypergranulation of the right cheek, ear and mastoid and generalized hypergranulation of the other burn areas (hypergranulation is not healthy tissue, it is a sign that grafting has been delayed) ; the limited grafting done by defendant Bankoff had resulted in incomplete takes; on his right thigh was a "free-knife" skin graft donor site mostly healed but with four areas of third-degree depth, slightly infected; he had restrictions of the right shoulder girdle, right elbow, right wrist and fingers of both hands from guarding and disuse; and he was suffering from third-degree defects over 25 per cent of his body, marked hypergranulation, contracted blood volume, malnutrition, muscular-skeletal dysfunction from disuse, and a bed sore. Dr. Hadley had to give him 2400 ccs. of blood (indicative of the fact he was anemic, attributable to delay in grafting) ; perform numerous (at least 10) surgeries; do

repair work to correct contractures (which developed because of failure to early graft) ; and apply skin grafts to cover the third-degree area defendant Bankoff had created on the right thigh. Dr. Hadley testified that when he first did surgery Gilbert had hypergranulation three-eights of an inch thick; and that had defendants done early grafting there would have been less, if anything, for him to do, and he would not have "the present problems of contracture deformity" with respect to Gilbert's hand.

Gilbert removed his coat and shirt and the jury viewed the injured portions of Gilbert's body. The result of the donor sites created after Gilbert's transfer to Children's Hospital was compared to that created by defendants on the right thigh (damage to the thigh was still visible) ; and various photos showed granulation tissue consisting mostly of blood-raw areas, six separate third-degree or "full-thickness" areas on the right thigh, and extensive scars. On the date of trial Gilbert had "full-thickness" grafts on his elbow and fingers; his hand had a contracture deformity; he was suffering from deep scar formation and residual scar contractures of the right hand resulting in its limitation — he was unable to open his hand fully and bring the thumb out—and from extensive, severe and permanent scarring and cosmetic deformity. Growth factors will further affect the contractural problem, and additional future surgery may be required; further surgery is indicated with respect to his ear.

The following standards of practice applicable among surgeons treating third-degree burn cases, established in the testimony of Dr. Hadley, Dr. Levonian, defendant Bankoff and defendant's expert, Dr. Barker, require:

1.   Determination of age and weight of patient and type of agent causing burn.

2.   Immediate debridement of burn area, continuing until grafting is completed.

3.   Pulse and blood pressure taken hourly in the beginning, and temperature, pulse and respiration recorded every four hours thereafter. (Defendant Bankoff admitted such readings are important to determine if patient is losing too much fluid.)

4.   Observation for shock.

5.   Prevention of intake by mouth for at least the first 48 or 72 hours.

6.   Establishment of a lifeline by intravenous method to control electrolyte balance and related matters; administra-

tion of antibiotics, morphine, tetanus toxoid or tetanus antitoxin; consultation and preparation of proper formula for electrolyte balance; placement of an indwelling catheter; and certain tests, examinations and studies — blood tests for electrolyte studies, electrolyte studies, potassium tests and sodium studies.

7. Placement on a high-vitamin, high-protein, high-caloric diet.

8. Treatment by exposure method or occlusive method.

9. Change of dressings every three or four days (because of oozing serum and necessity for applying antibiotics).

10. Adequate hospital facilities, personnel and equipment for treatment. All experts agree that standard practice calls for:

a. Placing the patient in isolation (a single-bed room) and treatment with isolation or sterile technique.

Infection is the cardinal problem and main cause of death in burn cases; third-degree burn is prone to infection and the patient should be placed in isolation (a private room) where no one may enter except under sterile conditions, and sterile technique is used throughout, even though bandages are used (infective organisms go through bandages); "a patient in a single room with isolation care would be less exposed to the possibility of extraneous fomite contamination"; infection is the cause of pain and nutritional disturbance and can spread merely by a person's exhaling in a room; and second-degree burns can be converted to third-degree areas by infection or delay in grafting.

b. A recognized recovery room.

c. The keeping of proper records.

The lack of facilities, personnel and equipment in defendant hospital is almost undisputed, and there is nothing in this record to show that Gilbert could not have been immediately transferred after emergency treatment. Dr. Levonian testified he should have been transferred as defendant hospital did not have proper facilities for treatment of third-degree burns; defendant Bankoff said he felt from the very beginning of Gilbert's stay that the facilities of defendant hospital were inferior, repeatedly stated to Gilbert's parents, and finally wrote, that "because of lack of facilities in this [defendant] hospital for treatment of such extensive burns" he was being transferred; and Dr. Barker testified that if defendant hospital lacked proper facilities Gilbert should have been transferred immediately to Children's Hospital — this

is standard practice — and there was nothing to prevent Gilbert's transfer immediately after his admission.

11. Commencement of skin grafting of hands, wrists and fingers as early as the fifth day, and grafting of other third-degree burn areas as quickly as possible — between the 14th and 21st day.

All experts agree that the sooner a denuded raw surface is covered the sooner the patient is rehabilitated, physiological balance is re-established and he feels better; early grafting prevents infection, reduces temperature, prevents loss of electrolytes, formation of scar tissue and scarring, minimizes the patient's expense, length of hospitalization, post-operative physiotherapy and rehabilitation, lessens chance of deep scar formation, permits a better "take," and leads to better permanent and cosmetic result; if early proper grafting is done no scars are expected; and second-degree burns can be converted into a third-degree area by delay in grafting. Dr. Levonian testified that the standard of practice requires that grafting start approximately two weeks after the burn; Dr. Barker testified it calls for grafting as soon as possible to prevent granulation tissue and contracture, early grafting prevents or reduces fibrosis or scar tissue, and a failure to graft will cause scar tissue formation which grows at the rate of one-eighth of an inch a week; defendant Bankoff admitted that grafting should be done on functional areas within 10 days, if grafting is not carried out a thick layer of granulating tissue will form followed by contractures, scar tissue grows at the rate of one-eighth of an inch per week, and excessive granulation leads to infection and prevents healing; and, Dr. Hadley testified that Gilbert's burns involved skin, subcutaneous fat and superficial fascia—not muscle, bone or other underlying structures, grafting of the hands, wrists and fingers should have been started the fifth day and grafting of other areas should have been started "certainly by the third week," and when he (Hadley) did his first surgery, Gilbert had hypergranulation three-eighths of an inch thick.

12. Use of split-thickness skin graft between five one-thousandths and fourteen one-thousandths of an inch.

Split-thickness grafts as thin as possible should be used; there is a better chance of thin grafts "taking"; "full-thickness" grafts are not recommended — they are less apt to "take" and they create other third degree areas which have to be covered. The "free-knife" method of taking skin is

"passé and unacceptable in any hospital in Los Angeles."
Dr. Barker testified that defendants created a "full-thick-
ness" or third-degree area on Gilbert's thigh, and in a
photograph of it counted six third-degree full-thickness
areas; that if an electric dermatome had been used such area
would not have been created; and that the third-degree
defect on the thigh is more consistent with "free-knife" —
a violation of standard practice.

13.    Early mobilization of functional areas.

The evidence shows that Gilbert's serious burns
required proper, adequate, competent and early attention;
that defendants kept him under their care in defendant
hospital, which was not equipped to properly treat third-
degree burns, for 53 days during which no substantial
definitive treatment was given; that while defendant Bankoff
did one very limited graft, it was delayed four weeks, granu-
lation had set in and scar tissue had started to form, "full-
thickness" skin was used, it was inadequate and it covered
only 1 per cent of the third-degree area, and in taking the
skin for the graft he created a third-degree defect on
Gilbert's thigh; and that defendants left 99 per cent of the
third-degree area, which had increased from 18 per cent to 25
per cent, uncovered. Defendant Bankoff's testimony discloses
Gilbert was ready for grafting as early as July 24; but
instead of grafting defendants permitted scar tissue to form,
for a period of 37 days thereafter, on 99 per cent of the third-
degree burn area. There appears to be no reasonable expla-
nation for the delay in grafting which violates standard
practice in treating third-degree burn cases. It can hardly be
said that during the first four weeks Gilbert's condition pre-
vented early grafting, for the evidence points to marked and
continued improvement after the first three days, only mini-
mal pain, no problems other than the burns themselves and
no shock. While defendant Bankoff contended that infection
prevented early and complete grafting, such claim is not
borne out by the record. First he said that Gilbert suffered
from infection for the full time, later he testified it was four
weeks, and finally he admitted infection was only "mild" or
"minor." Moreover, no infection was ever noted in any
hospital, doctor's or nurse's record, Gilbert was never
removed from a 10-bed ward, his pulse, respiration and blood
pressure were never taken and recorded, no treatment was
ever given for the infection claimed by defendants, and no
hospital record shows the delay in grafting was due to

240

infection; to the contrary, the evidence establishes that if Gilbert had any infection it was caused by the delay in grafting. The record supports Dr. Levonian's testimony that Gilbert's general condition did not prevent early grafting and defendant Bankoff's admission that Gilbert was ready for grafting as early as July 24, and should have had all of the third-degree burn areas grafted on August 28.

In the major areas controlled by standard practice the evidence is clear that defendant Bankoff failed to exercise that degree of care which the average reasonable physician would have exercised under the same or similar circumstances, the proximate result of which was Gilbert's extended hospitalization, numerous additional surgeries, repair work to correct contractures, contractural deformity and limitation of the right hand, residual deep-scar formation and scar contractures, and extensive severe and permanent scarring and cosmetic deformity.

In view of the foregoing we deem it unnecessary to discuss at length appellants' claim that plaintiffs failed to prove prima facie that they violated the standard of practice with respect to their treatment of Gilbert or, if they did, their negligence was the proximate cause of any damage to him.

■ In denying defendants' motions for directed verdict, judgment notwithstanding the verdict, and new trial, the trial judge in effect held, and properly so, that the evidence was sufficient as a matter of law, and that the matter of negligence and proximate cause was a question of fact for the jury. (*Parker* v. *San Francisco*, 158 Cal.App.2d 597 [323 P.2d 108]; *Lindsey* v. *De Vaux*, 50 Cal.App.2d 445 [123 P.2d 144].) ■ There being substantial evidence to support the verdict we will not substitute our determination therefor.

■ As to proximate cause in malpractice cases the rule is well stated in *Soest* v. *Balsinger*, 60 Cal.App.2d 441 [141 P.2d 13], citing *Mirich* v. *Balsinger*, 53 Cal.App.2d 103 [127 P.2d 639] : " 'It must also be remembered that in malpractice cases it is not necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence of the physician resulted in the injury to the patient. Were such the rule, it would rarely be possible to recover in a case of negligence in the practice of a profession which admittedly is not an exact science. It is therefore not required in the trial of such cases that the negligence of the defendant as the proximate cause of the injury be established with such absolute certainty that any other conclusion is excluded. Substantial

evidence which reasonably supports the judgment is sufficient. (*Dimock* v. *Miller*, 202 Cal. 668, 671 [262 P. 311].)' '' (P. 451.) (*Smith* v. *Coleman*, 46 Cal.App.2d 507 [116 P. 2d 133]; *Dimock* v. *Miller*, 202 Cal. 668 (262 P. 311]; *Barham* v. *Widing*, 210 Cal. 206 [291 P. 173].)

Dr. Hadley, a duly qualified expert, testified at length concerning the standard of practice in third-degree burn cases, much of which was corroborated by other witnesses; his further testimony was to the effect that medical experience (the results in a majority of cases) has shown that better results are obtained in treating third-degree burns by using thin skin grafts at an early state of treatment. Such testimony tends to prove the reasonable certainty that such consequences will follow in any given case of like burns and therefore, the failure to conform to the standard of practice here resulted in Gilbert's present serious condition. A doctor testifying concerning the results of an injury is not required to state that such results are reasonably certain; " 'in determining the question courts and juries must rely upon the testimony of properly qualified physicians for such testimony as will in the minds of the jury establish the fact in issue to a reasonable certainty.' '' (*Bauman* v. *City & County of San Francisco*, 42 Cal.App.2d 144, 164 [108 P.2d 989].) " 'As a rule, the physician whose opinion is most reliable is loath to give an opinion as to what consequences will or will not follow as a result of an injury in a certain case, but at the same time willing, as here, to state the result of his own professional experience and observations in treating cases where like injuries have occurred, and as a result of that experience say that we might or might not expect like results to follow in this case. Testimony of duly qualified experts which shows that in a majority of cases where the injury consists of a fracture at the base of the brain, such injury results in future epilepsy, paralysis, or mental deterioration. tends to prove the reasonable certainty that such consequences will follow in any given case of like injury.' '' (Pp. 164, 165 of 42 Cal.App.2d.) (*Hagy* v. *Allied Chemical & Dye Corp.*, 122 Cal.App.2d 361 [265 P.2d 86]; *Lindsey* v. *De Vaux*, 50 Cal.App.2d 445 [123 P.2d 144]; *Burford* v. *Baker*, 53 Cal. App.2d 301 [127 P.2d 941].)

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.